# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 24-1177

---

DAMILARE SONOIKI,

*Plaintiff-Appellant,*

v.

HARVARD UNIVERSITY, HARVARD UNIVERSITY BOARD OF OVERSEERS, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS IN CASE NO. 1:19-cv-12172-LTS, BEFORE THE HONORABLE LEO T. SOROKIN, UNITED STATES DISTRICT JUDGE

## PUBLIC BRIEF FOR DEFENDANTS-APPELLEES

VICTORIA L. STEINBERG
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, Massachusetts 02111
(617) 481-0160

ANTON METLITSKY
DAVID COHEN
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
(212) 326-2000

*Counsel for Defendants-Appellees*

January 6, 2025

 CP COUNSEL PRESS    (800) 4-APPEAL • (333278)

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees Harvard University, Harvard University Board of Overseers, and the President and Fellows of Harvard College ("Harvard") submit the following corporate disclosure: Harvard states that it is a non-profit educational corporation that is not a subsidiary of any other corporation and has no stock.[*]

---

[*] Sonoiki's Complaint incorrectly identifies the Harvard entities as "Harvard University, Harvard University Board of Overseers, and The President and Fellows of Harvard College." The President and Fellows of Harvard College is the legal entity that comprises the various named defendants and is the only proper party to this litigation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION ......................................................................5

STATEMENT OF THE ISSUES ...........................................................................5

STATEMENT OF THE CASE................................................................................6

      A.     Factual Background.........................................................................8

      B.     Prior Proceedings ..........................................................................15

      C.     Decision Below ..............................................................................16

SUMMARY OF ARGUMENT..............................................................................19

STANDARD OF REVIEW ..................................................................................23

ARGUMENT .......................................................................................................24

I.      THE DISTRICT COURT APPLIED THE CORRECT LEGAL
      STANDARDS.............................................................................................24

II.     THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
     JUDGMENT ON SONOIKI'S DISCIPLINARY-PROCESS
     THEORIES. ...............................................................................................28

      A.     The Undisputed Facts Refute Sonoiki's Duty-To-Advocate
            Theory.............................................................................................28

      B.     The Undisputed Facts Refute Sonoiki's Breach-Of-
            Confidentiality Theory. ..................................................................39

      C.     The Undisputed Facts Refute Sonoiki's Witness-Name Theory. ........42

      D.     The Undisputed Facts Refute Sonoiki's Initial-Meeting Theory. .......44

      E.     The Undisputed Facts Refute Sonoiki's Cumulative-Error
            Theory.............................................................................................46

III.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
     JUDGMENT ON SONOIKI'S DEGREE THEORY....................................46

      A.     Sonoiki's Assertion That Harvard Had No Right To Withhold
            His Degree While It Investigated The Sexual Assault

Complaints Against Him Is Unreasonable, As The District Court Correctly Concluded. ..................................................47

B.    The Undisputed Facts Show That Sonoiki Has No Present Contractual Right To His Degree In Any Event.................................57

CONCLUSION ........................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................26

*Astra USA, Inc. v. Bildman*,
  914 N.E.2d 36 (Mass. 2009)........................................................51

*Bank v. Thermo Elemental Inc.*,
  888 N.E.2d 897 (Mass. 2008)............................................ 29, 31, 54

*Bellone v. Southwick-Tolland Reg'l Sch. Dist.*,
  748 F.3d 418 (1st Cir. 2014) .......................................................24

*Bulwer v. Mount Auburn Hosp.*,
  46 N.E.3d 24 (Mass. 2016)...........................................................27

*Cuyler v. Sullivan*,
  446 U.S. 335 (1980) ...................................................................38

*Deaton v. Town of Barrington*,
  100 F.4th 348 (1st Cir. 2024).......................................................25

*Doe v. Brandeis University*,
  2023 WL 1822785 (D. Mass. Feb. 8, 2023).......................................25

*Doe v. Stonehill Coll., Inc.*,
  55 F.4th 302 (1st Cir. 2022)................................................ 26, 27, 46

*Doe v. Trustees of Boston College*,
  892 F.3d 67 (1st Cir. 2018)................................................... 25, 26

*Doe v. Williams Coll.*,
  2022 WL 4099273 (D. Mass. Sept. 7, 2022).....................................27

*Fishman v. LaSalle Nat'l Bank*,
  247 F.3d 300 (1st Cir. 2001)................................................. 40, 54

*Gibson Found., Inc. v. Norris*,
  88 F.4th 1 (1st Cir. 2023)............................................................49

*Happ v. Corning, Inc.*,
  466 F.3d 41 (1st Cir. 2006)..........................................................50

*Havlik v. Johnson & Wales Univ.*,
  509 F.3d 25 (1st Cir. 2007).........................................................26

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Hoover v. Hyatt Hotels Corp.*,
  99 F.4th 45 (1st Cir. 2024) ..................................................................25

*In re Minkina*,
  79 F.4th 142 (1st Cir. 2023) .................................................................50

*Iverson v. City of Boston*,
  452 F.3d 94 (1st Cir. 2006) ..................................................................24

*Mack v. Great Atl. & Pac. Tea Co.*,
  871 F.2d 179 (1st Cir. 1989) ........................................................... 25, 36

*McAdams v. Mass. Mut. Life Ins. Co.*,
  391 F.3d 287 (1st Cir. 2004) ........................................................... 54, 56

*Mesnick v. Gen. Elec. Co.*,
  950 F.2d 816 (1st Cir. 1991) ................................................................25

*Minturn v. Monrad*,
  64 F.4th 9 (1st Cir. 2023) ....................................................................52

*Mirabella v. Town of Lexington*,
  64 F.4th 55 (1st Cir. 2023) ............................................................. 25, 42

*Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc.*,
  233 F.3d 1 (1st Cir. 2000) ....................................................................56

*Scott v. Harris*,
  550 U.S. 372 (2007) ............................................................................45

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999) ..................................................................45

*Sonoiki v. Harvard Univ.*,
  37 F.4th 691 (1st Cir. 2022) ........................................................ *passim*

*Su v. F.W. Webb Co.*,
  110 F.4th 391 (1st Cir. 2024) ......................................................... 33, 34

*Walker v. President and Fellows of Harvard Coll.*,
  82 F. Supp. 3d 524 (D. Mass. 2014) .....................................................26

*Walsh v. TelTech Sys., Inc.*,
  821 F.3d 155 (1st Cir. 2016) ................................................................25

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Watson v. Edmark*,
  118 F.4th 456 (1st Cir. 2024) .................................................................23

**Other Authorities**

Mercer R. Cook & Rebecca D. Robbins, *Ad Board's Advising System Faces
  Criticism*, The Harvard Crimson (Oct. 24, 2012) ................................................30

**INTRODUCTION**

Several days before Plaintiff Damilare Sonoiki was scheduled to graduate from Harvard in 2013, two students filed sexual assault complaints against him. A third student filed a similar complaint several days later. In accordance with its published policies, Harvard withheld Sonoiki's degree while the Administrative Board ("Ad Board")—the Harvard body charged with investigating and resolving disciplinary cases—preliminarily investigated the complaints. That preliminary investigation concluded that a more formal investigation was warranted, so the Ad Board issued a formal "charge" as Harvard's written policies require. The Ad Board's subsequent investigation confirmed the allegations that Sonoiki had sexually assaulted three fellow students. Thus, the Ad Board concluded that he should be dismissed from Harvard without obtaining a degree. Sonoiki's administrative appeal was denied.

Since leaving Harvard, Sonoiki worked at Goldman Sachs without a degree, committed insider trading, left finance and worked in the entertainment industry, was indicted and pleaded guilty to insider trading, and then in 2019 filed this lawsuit after it became public that he was found to have committed serious sexual misconduct while at Harvard.

Sonoiki's lawsuit originally alleged that Harvard (i) breached its contract with Sonoiki by failing to follow its published disciplinary procedures in numerous

1

respects, (ii) violated Massachusetts's "basic fairness" principles, (iii) breached the covenant of good faith and fair dealing, and (iv) was liable for estoppel. The district court dismissed the complaint. This Court affirmed as to all but several of the breach-of-contract theories, concluding that under the forgiving pleading standards applicable at the dismissal stage, Sonoiki should be allowed discovery as to those theories. Harvard and Sonoiki—who was represented by experienced counsel at every stage below—conducted thorough discovery, Harvard moved for summary judgment, and the district court granted the motion. That decision should be affirmed because discovery has shown that Sonoiki's claims are meritless.

Sonoiki's appellate brief begins with four challenges to the process the Ad Board used to investigate and resolve Sonoiki's claim. While this Court held that Sonoiki's complaint adequately alleged that Harvard failed to follow the procedures it promised students in four respects, the evidence adduced in discovery showed otherwise. Among other findings, the district court correctly concluded that Sonoiki's claims—which he never raised before the Ad Board or in his administrative appeal—have no merit:

- Sonoiki alleges that his Ad Board Representative, Laura Johnson, breached her duty to advocate for him. But even if Harvard's procedures established such an advocacy duty, Sonoiki has not cited a single fact,

despite extensive discovery on this subject, suggesting that Johnson violated it.

- Sonoiki alleges that Johnson also improperly divulged confidential information. Yet discovery has shown that not only do Board Representatives have no duty of confidentiality, but Sonoiki cannot name a single piece of confidential information that he believes Johnson divulged.

- Sonoiki argues that Harvard failed to tell him the names of the witnesses against him. But the record shows that Sonoiki knew witness names; if he did not, it was because Johnson tried to tell him but he refused to listen; and Sonoiki has failed to show harm in any event.

- Sonoiki alleges that Johnson failed to attend a meeting that the evidence shows she attended, and even assuming she did not, Sonoiki has failed to demonstrate any harm.

Sonoiki separately contends that Harvard was required to grant him his degree at Commencement even though two students filed complaints several days earlier accusing him of sexually assaulting them. Sonoiki does not dispute that a student who committed multiple sexual assaults against fellow students is not entitled to a Harvard degree. As explained, Harvard's procedures provide for a preliminary investigation into such complaints followed, if necessary, by a formal

"charge" and a more in-depth disciplinary investigation. Sonoiki's position is that Harvard had two choices on graduation day: either forgo the preliminary investigation and issue a formal "charge" without any investigation at all, or grant Sonoiki a degree even though he may have sexually assaulted several fellow students while enrolled.

This Court previously held at the pleading stage, and based solely on a linguistic ambiguity in Harvard's procedural documents, that this claim could proceed to discovery. That discovery decisively foreclosed Sonoiki's position. As the district court methodically explained, Sonoiki's argument is inconsistent with the language and structure of Harvard's procedures, with context, and with common sense. It also contradicts the parties' course of conduct, which demonstrates that *both* Harvard *and* Sonoiki understood that once the complaints against him were filed, the Ad Board would investigate the complaints and withhold Sonoiki's degree until the investigation was resolved, at which point the Ad Board would decide what remedy, if any, was warranted. And even if Sonoiki was somehow right about his reading of Harvard's procedures, it would not matter because it is undisputed that even if Harvard were required provisionally to grant Sonoiki a degree on graduation day, it would have had the power to revoke that degree once it finally concluded that the allegations against Sonoiki were true.

In short, discovery has shown that Sonoiki's argument that Harvard was required to grant him a degree *even if he raped three fellow students* because the Ad Board followed its procedures and preliminarily investigated the complaints against him rather than formally charging him without preliminary investigation is absurd, and the district court's rejection of that argument should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332. The district court entered final judgment on February 6, 2024. ADD1.[1] Sonoiki timely noticed his appeal on February 21, 2024. Notice of Appeal, Dkt. 190. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly concluded that Sonoiki failed to demonstrate any genuine dispute of material fact as to his breach-of-contract claim alleging that Harvard failed to follow the disciplinary procedures set forth in its student handbook and related documents.

2. Whether the district court correctly concluded that Sonoiki failed to demonstrate any genuine dispute of material fact as to whether Harvard was authorized to withhold his degree while it investigated pre-graduation complaints by multiple students alleging that he had sexually assaulted them.

_____

[1] "ADD" refers to the addendum to this brief.

## STATEMENT OF THE CASE

Sonoiki matriculated at Harvard College in 2009.  ADD5.  Three women—Ann, Betty, and Cindy[2]—accused him of sexual misconduct that occurred in 2011, 2012, and 2013.  ADD5-7.  Harvard instituted disciplinary proceedings against Sonoiki in 2013, just before his graduation.

After an in-depth, multi-step investigation established in Harvard's then-applicable Student Handbook and associated documents, Harvard's Ad Board concluded that Sonoiki committed the alleged sexual misconduct.  Years later, Sonoiki, represented by counsel,[3] brought this suit.  His complaint was dismissed by the district court, and this Court affirmed in large part, except for several contract-based theories that the Court allowed to proceed to discovery.  Those claims alleged that Harvard breached its contract with Sonoiki by failing to follow its disciplinary procedures in four respects:  that (i) Sonoiki's Board Representative, Laura Johnson, failed to advocate on his behalf despite an alleged duty to do so under Harvard's published procedures (the "Duty-to-Advocate Theory"); (ii) Johnson breached a duty of confidentiality stemming from those same procedures (the "Breach-of-Confidentiality Theory"); (iii) Harvard failed to

---

[2] This brief refers to the complainants by pseudonyms because of the sensitive subject matter involved.

[3] Sonoiki was represented by experienced counsel through the district court's entry of judgment.

provide Sonoiki with the names of witnesses against him (the "Witness-Name Theory"); and (iv) Ellison failed to include Johnson in his initial meeting about the complaints (the "Initial-Meeting Theory"). *See Sonoiki v. Harvard Univ.*, 37 F.4th 691, 710-13 (1st Cir. 2022). The fifth contract-based theory was that Harvard was not authorized to withhold Sonoiki's degree at graduation because it was still preliminarily investigating the allegations of sexual misconduct before Commencement and had not issued a formal "charge" yet (the "Degree Theory"). *See id.* at 704-06.

After discovery, the district court granted Harvard's motion for summary judgment as to each of these remaining contract theories. The following undisputed facts, reflected in the summary judgment record,[4] are relevant to resolving Sonoiki's appeal of that decision.

---

[4] Sonoiki's brief improperly relies on allegations in his complaint that were not substantiated through discovery. *See, e.g.*, Sonoiki Br. 4 (relying on unproven complaint allegation that Cindy was "pressured ... to file a complaint"). Sonoiki's appendix also contains documents that were not a part of the summary judgment record, and that Sonoiki's brief cites repeatedly. *See* Harvard Mot. to File Supplemental Appendix at 2. Because of this and other deficiencies in Sonoiki's appendix, Harvard has moved for permission to file a supplemental appendix. *See generally id.* "SA" cites are to that supplemental appendix.

**A.** **Factual Background**

1. *Ann and Cindy Initiate Complaints Against Sonoiki Before*
   *Graduation and Sonoiki is Told He Will Not Receive His*
   *Degree.*

On May 17, 2013, Harvard's Ad Board Secretary, Jay Ellison, met with

Sonoiki and explained that several students had raised concerns that he may have

violated Harvard's sexual misconduct policies. SA1718-19, SA1725-27, SA2105.

Ellison memorialized that conversation in a letter. SA423-24, SA2105-16. The

same day, Sonoiki's Resident Dean, Laura Johnson, emailed Sonoiki about his

meeting with Ellison, asking whether there was anything she could do to be helpful

or answer any questions. SA2106. Sonoiki and Johnson spoke later that day, at

which time Sonoiki understood that the allegations of sexual misconduct were

"more serious" than he initially thought. SA1726-29, SA1739-40, SA2106-07.

On May 28, 2013, two days before Sonoiki's graduation ceremony, two

women, Ann and Cindy, filed separate sexual misconduct complaints against

Sonoiki, alleging that he engaged in non-consensual sexual intercourse with them.

SA119, SA1096-121, SA1232-1250, SA1599, SA2108. That same day, Ellison

emailed Sonoiki saying he and Sonoiki needed to meet "to discuss a very important

issue" and that even though Sonoiki knew the subject matter of the proposed

meeting, it was important they meet again. SA535, SA2108. Sonoiki did not

respond. SA418, SA1743-46, SA2109.

On May 29, 2013, Ellison emailed Sonoiki a second time, said he needed to see Sonoiki "right away," and asked Sonoiki to come to his office that day. SA700, SA2019. Again, Sonoiki did not respond. SA415-16, SA700, SA1743-46, SA2114. Johnson emailed Sonoiki a letter from Ellison that explained the Ad Board had "received formal complaints" from two students, and that he would therefore "not be eligible to receive [his] degree on Commencement Day, May 30, 2013." SA417-18, SA2109. Ellison also notified Harvard's governing boards on May 29, 2013 that they should refrain from voting on awarding Sonoiki his degree because of the complaints. SA420, SA435, SA1562, SA2111-12.

On May 30, 2013, Sonoiki responded to Ellison, indicating he had "fallen very behind on emails," and asked to meet with Ellison that evening. SA700, SA2114. They scheduled a phone meeting (which would also include Johnson) for the following Monday, June 3, 2013. SA415, SA2114-15. In the interim, Sonoiki walked at graduation but did not receive a degree. SA120, SA1565, SA2116.

In advance of the June 3 meeting, Ellison emailed Sonoiki the ███████ ████████████████ him—four separate documents, including a document titled "The Administrative Board of Harvard College Information for students facing allegations in a peer dispute case" (the "Student Information Form"). SA702, SA2116. During the June 3 call, Ellison reviewed the Student Information Form, which described in detail the disciplinary procedures that govern sexual

9

misconduct cases.  SA304, SA413, SA1722, SA2118-19.  The same day, Ellison emailed Sonoiki two letters informing him of the formal complaints against him and reiterating that he would not receive his degree while the cases were pending.  SA446-47, SA540, SA827-28, SA2119.

As part of the disciplinary procedure, Sonoiki could choose a member of the Ad Board to serve as his Board Representative, a role that acts as a liaison between Sonoiki and the entire Ad Board.  SA259.  Sonoiki selected Johnson.  SA2126-27.  Sonoiki could also choose a "personal adviser," provided that person was not a member of the Ad Board, SA2127-28, but he chose not to do so.  SA2128.

### 2.     *Betty Initiates a Complaint Against Sonoiki.*

On June 4, 2013, a third woman, Betty, submitted a complaint alleging that Sonoiki had sexually assaulted her on several occasions.  SA120, SA712-13, SA1159, SA2119-20.  The same day, Ellison emailed Sonoiki (copying Johnson) to ask if Sonoiki had a few minutes the following afternoon to discuss the new complaint and the other cases.  SA836, SA2120.  The next day, June 5, Ellison emailed Sonoiki a letter informing him of Betty's formal complaint.  SA712-13, SA2121.  Sonoiki again chose Johnson as his Board Representative in Betty's case.  SA2126-27.

10

3.   *The Investigation and Findings of Sexual Misconduct.*

Consistent with the disciplinary procedures set forth in the Student

Information Form, which governed peer disputes such as Sonoiki's cases, SA125-

26, SA257, SA1764-65, SA2090, SA2122, an Ad Board Subcommittee and an

independent factfinder were assigned to investigate each of the three complaints to

determine whether a charge should issue. *E.g.*, SA1098-99, SA2124. Under the

disciplinary procedures, a "charge" meant that the Ad Board had determined that

the allegations, if true, might constitute a violation of the Harvard College rules.

SA257, SA2092-93. The Subcommittee and independent factfinder began by

soliciting statements and responses from, and then interviewing, Sonoiki and the

three complainants. *E.g.*, SA2129-31. On June 21, 2013, the Subcommittee

recommended that the Ad Board issue charges against Sonoiki in each case.

SA897, SA2134. The Board adopted that recommendation and referred the cases

for further investigation. SA902, SA1614, SA2134-35.

Between June and September 2013, the Subcommittee solicited additional

written statements from the complainants, Sonoiki, and several witnesses.

SA2135-37. Sonoiki received copies of each written statement. SA2137-38. The

Subcommittee also collected documentary evidence from the complainants,

Sonoiki, and several witnesses; Sonoiki received copies of all of that material.

SA1008-18, SA2140. Through October 2013, the Subcommittee interviewed the

people from whom it had received written statements, including Sonoiki.  SA2140-42.

Consistent with the disciplinary procedures, Johnson was allowed to attend all the interviews so that she could tell Sonoiki what was said.  SA259, SA387-88, SA1008-18, SA2093, SA2139-40.  Johnson repeatedly offered to share with Sonoiki what she learned in the witness interviews, but Sonoiki rejected these offers.  SA387-88, SA1005, SA1008, SA2139-40.  In their email exchanges between June and November 2013, Johnson also asked Sonoiki on multiple occasions if he had any questions, and she encouraged him to reach out to Ellison if Sonoiki was confused about the disciplinary process.  SA396, SA401, SA832-33, SA879, SA890-92, SA895, SA897, SA902, SA904, SA914, SA938-40, SA1084-85, SA1614, SA1761, SA2134-35, SA2145, SA2150-51.  Sonoiki repeatedly rejected these offers too.  SA261, SA902, SA904, SA2135.

On November 13, 2013, the Subcommittee issued three lengthy reports.  SA150, SA1084-85, SA2145.  Each report found that Sonoiki had violated Harvard's prohibition against sexual misconduct and recommended that the Ad Board: (i) require Sonoiki to withdraw from Harvard College and (ii) recommend to Harvard's Faculty Council that Sonoiki be dismissed, severing his connection to Harvard and allowing readmission only by a vote of the Faculty Council.  SA150, SA1084-85, SA1115, SA1174, SA1249, SA2145-46.  Sonoiki received the reports

and was given the opportunity to respond to them in writing. SA150, SA1084-85, SA2145. On November 19, 2013, the Ad Board agreed with the Subcommittee's recommendations, and on November 25, 2013, it notified Sonoiki of its decision requiring his withdrawal and recommending to the Faculty Council that he be dismissed. SA530, SA686, SA820, SA2149.

4. *Sonoiki's Appeal To The Faculty Council.*

In May 2014, Sonoiki appealed to the Faculty Council. SA153, SA1363-427, SA2151. Sonoiki argued the Ad Board process "was fundamentally unfair" in that he was "blind-sided by the subcommittee's recommendation of dismissal" because "Cindy told [him] the worst thing that could happen to [him was] that [he] would have to withdraw for one or two years." SA1404-47, SA2151. Sonoiki's appeal included none of the arguments that he raises in this litigation as to why Harvard's process resulting in his dismissal was purportedly procedurally improper.

On October 16, 2014, Sonoiki received a letter stating that the Faculty Council denied his appeal. SA1458-60, SA2152. On December 10, 2014, the Faculty Council dismissed Sonoiki from Harvard College. SA154, SA1466, SA2152.

5.    *Sonoiki's Employment and Insider Trading Guilty Plea*

Before his planned graduation date, Sonoiki had been offered a job at Goldman Sachs.  SA1670-71, SA2156.  He began working there in June 2013, even though he had not received his degree.  SA906, SA1670-71, SA2156.  Beginning in July 2014 at the latest, and while at Goldman Sachs, Sonoiki engaged in an insider trading scheme that lasted through November 2014.  SA274-78, , SA1704-05, SA2164.  At some point, an anonymous person called someone affiliated with Goldman Sachs and said Sonoiki never graduated from Harvard.  SA1786, SA1813, SA2157.  Goldman Sachs was surprised to learn Sonoiki had never received his degree.  SA1429-30, SA1677, SA2156.  Around May 2014, Sonoiki was offered a two-year position at Taconic Capital Partners ("Taconic"), a hedge fund, but the offer was rescinded because of an unsuccessful background check and the fact that Sonoiki had ███ on his resume about receiving a degree.  SA1340-47, SA1360, SA1429-30, SA2157-58.

Sonoiki resigned from Goldman Sachs around May 2015 and has not since worked in the financial industry.  SA2159.  He transitioned to the entertainment industry, and was a comedy writer for various television shows in Hollywood, including *The Simpsons* and *Black-ish*.  SA1681-87, SA2159.

In August 2018, Sonoiki was charged with insider trading stemming from his time at Goldman Sachs, and he pleaded guilty in federal court in September

2018.  SA281-82, SA293, SA1708-10, SA2164-65.  Sonoiki's insider trading conviction attracted media attention; the media reported on his insider trading and also his sexual misconduct while at Harvard.  SA285-88, SA1508-10, SA1512-14, SA2168.  Sonoiki ultimately lost his job at *The Simpsons* because he had withheld information about the insider trading charges and the sexual misconduct allegations from his employer.  SA1512-1514, SA2163.

### B.  Prior Proceedings

In 2019—years after he was dismissed from Harvard but about a year after his insider trading and sexual misconduct became public—Sonoiki filed this suit, alleging four counts: breach of contract (Count One); denial of basic fairness (Count Two); breach of the covenant of good faith and fair dealing (Count Three); and estoppel and reliance (Count Four).  SA50-58.  The district court dismissed the complaint.

This Court affirmed in part and reversed in part.  *See Sonoiki v. Harvard Univ.*, 37 F.4th 691 (1st Cir. 2022).  It affirmed dismissal of Counts Two, Three, and Four.  *Id.* at 714-17.  As for Count One, the Court dismissed many of Sonoiki's theories but allowed the five contract-based theories set forth above to proceed to discovery.  *See supra* at 6-7.

The parties subsequently engaged in robust discovery.  Sonoiki deposed Johnson, Ellison, and Harvard's dean of student services, in addition to an expert

witness.  Harvard deposed Sonoiki and two of his experts.  Harvard produced thousands of pages of documents related to the controversy.

### C.    Decision Below

After discovery, the district court granted summary judgment to Harvard on Sonoiki's remaining theories.  ADD1-45.  As to each of the five remaining theories, the court held either that Sonoiki had failed to identify evidence showing any breach of contract or that he had failed to identify evidence showing harm from the asserted breach, which is one of the elements of a breach-of-contract claim (or both).

Duty-to-Advocate Theory.  Sonoiki claimed that Johnson breached a duty to advocate on his behalf.  The court concluded that while "[a] reasonable student could conclude that his Board Representative would act as an advocate in some form," it "need not define the precise contours of the Board Representative's advocacy responsibilities, because Sonoiki must submit evidence that Johnson breached her duty" and, "[w]ith the full benefit of discovery," failed to do so. ADD23-24.

Breach-of-Confidentiality Theory.  The court next considered Sonoiki's claim that Johnson breached a duty of confidentiality.  ADD27-28.  The court drew "all inferences in Sonoiki's favor" and concluded that "a reasonable student could expect his Board Representative to keep their discussions, or at least some portion

of them, confidential." ADD27. The court nevertheless held that Sonoiki "fail[ed] to show that Johnson breached her duty" because "Sonoiki cannot identify any confidential information that she did disclose—even after full discovery." ADD27-28. The court also held that, "[e]ven if Sonoiki could provide evidence establishing such a breach, he has not offered any evidence to show that the breach affected the outcome of the disciplinary proceedings against him," as is "necessary to prove harm." ADD28.

Witness-Name Theory. The court then turned to Sonoiki's claim that "Harvard breached the contract because Johnson failed to give him the names of all witnesses who provided evidence to the Ad Board." ADD29. The court granted Harvard summary judgment because Sonoiki offered "no evidence that he suffered harm as a result" of the supposed breach. ADD30. The court observed that even if Sonoiki had not learned some of the witness names during his proceeding, *but see infra* at 42-43 (showing that Sonoiki indisputably did know the witness names), he later learned all of them during discovery, and yet he did not demonstrate (or even allege) that he would have done anything differently had he heard the witnesses' names earlier in the process. *Id.*

Initial-Meeting Theory. The court also rejected Sonoiki's argument that Harvard breached a duty to have Johnson "present for his initial meeting with

Ellison." ADD31.[5]  The court found that even if Johnson was not at that meeting,

"Sonoiki has not provided any evidence suggested that he suffered harm."

ADD32.

Degree Theory.  Finally, the court considered Sonoiki's argument that

Harvard exceeded its contractual authority by withholding Sonoiki's degree while

it investigated complaints filed by several students before his graduation that

Sonoiki sexually assaulted them.  As explained above, the Student Information

Form that sets out the procedures in student disciplinary cases provides a two-step

investigatory process:  a preliminary investigation to determine whether the

allegations are sufficiently serious to warrant a formal charge, and then a more

formal investigation thereafter.  Sonoiki's position is that Harvard lacked authority

to withhold his degree unless it forwent the first step (preliminary investigation)

and issued a formal charge without any preliminary investigation at all.  The

district court rejected that argument on the discovery record for "separate and

independent reason[s]."  ADD37.

First, the court held that Sonoiki could not establish harm from this theory

because "the undisputed facts establish that Harvard can revoke a previously issued

degree based upon its determination that the graduate, while a student, violated

---

[5] Another portion of the district court's decision concerned Sonoiki's assertion that no initial meeting was held as to Betty's complaint.  ADD25.  Sonoiki does not raise this issue on appeal, so it is forfeited.

Harvard's policies." ADD36.  Hence, even if Harvard had granted Sonoiki a degree at his graduation, it would have been "free to proceed with a post-commencement revocation identical to the proceeding it conducted." ADD36-37.  That fact meant that Sonoiki "has not established a *present* contractual right to the degree." ADD36.

Second, the district court held that in any event, "Sonoiki fails to establish that a factfinder could endorse his interpretation of the contract as one an objectively reasonable student would fairly reach," in light of the relevant contractual provisions and the "full factual record" adduced through discovery, including the relevant context and the parties' course of conduct.  ADD37.

The Court thus "conclude[d] that Sonoiki failed to establish that he was entitled to a degree under the contract on May 30, 2013." ADD44.

## SUMMARY OF ARGUMENT

**I.**  While most of Sonoiki's challenges to the district court's opinion are fact-bound, he also contends that the district court incorrectly applied the law in two respects.  Not so.

Sonoiki first criticizes the district court's holding that only "definite, competent evidence" can create a material factual dispute.  But that is black-letter summary judgment law.  And contrary to Sonoiki's contention, that standard applies in all contexts, not just in employment discrimination cases.

Sonoiki also contends that the district court wrongly held that to prevail on his breach-of-contract claim, Sonoiki must show not only that Harvard breached a reasonable contractual expectation, but also that he was harmed by the breach. But again, the district court simply applied black-letter contract law, which this Court has expressly applied in the university disciplinary context.

**II.** The district court properly rejected Sonoiki's four objections to the way Harvard conducted its disciplinary process.

**A.** Sonoiki's contention that Laura Johnson, his Board Representative, failed to satisfy her duty to advocate in his favor fails for two basic reasons. First, Harvard's procedural documents as well as the relevant extrinsic evidence show that a Board Representative has no such duty. Unlike a personal advisor (which Sonoiki chose not to select), a Board Representative does not advocate for a student but objectively represents the student's position to the Ad Board. Second, and in any event, the district court properly held that Sonoiki failed to show that Johnson failed to advocate for him in any respect, despite extensive discovery including a deposition of Johnson. None of Sonoiki's responses undermines the district court's careful analysis.

**B.** The district court also properly rejected Sonoiki's contention that Johnson breached her alleged duty of confidentiality. That is again so for two reasons. First, the relevant procedural documents and extrinsic evidence show

there is no such duty.  Second, the district court correctly explained that Sonoiki has failed to show that Johnson ever revealed any of his confidences.  Even on appeal, Sonoiki fails to identify a single instance in which he believes Johnson disclosed confidential information.

**C.**  Sonoiki's argument that Harvard breached its contract by failing to inform him of the names of the disciplinary-proceeding witnesses fails for four reasons.  First, the undisputed evidence shows that Sonoiki knew the witnesses' names.  Second, if he somehow did not, that is his fault, not Harvard's.  Sonoiki was told at the outset that he could ask for witnesses' names but (according to him) he did not, and he further rejected Johnson's repeated efforts to review witness interviews.  Third, Sonoiki learned all the witness names through discovery but has been unable to show what he would have done differently, and thus cannot demonstrate any harm.  Fourth, Sonoiki failed to raise this issue during his appeal of the Ad Board's determination, further demonstrating that Sonoiki fabricated this issue for litigation.

**D.**  Sonoiki's contention that Harvard breached its contract because Laura Johnson did not attend his initial meeting with Jay Ellison fails for two reasons.  First, the undisputed evidence shows that Johnson did attend.  Second, even if she did not, Sonoiki offers no evidence of harm, as the district court correctly concluded.

**E.** The district court also properly rejected Sonoiki's argument that he was harmed by cumulative breaches by Harvard.

**III.** Finally, the district court correctly rejected Sonoiki's argument that Harvard had no authority to withhold his degree while it investigated the pre-graduation complaints of sexual assault.

**A.** All agree that if Sonoiki did in fact sexually assault fellow students while at Harvard, he would not be eligible to graduate. There is likewise no dispute that the Ad Board's written procedures provide that when a sexual-misconduct complaint is filed, the Board first conducts a preliminary investigation to determine whether a formal "charge" is warranted, and only if a charge is issued is a more in-depth investigation conducted.

Sonoiki contends, however, that Harvard is only allowed to withhold a degree if a formal charge has already issued before Commencement. According to Sonoiki, if Commencement occurs before the preliminary investigation is complete, the Ad Board is precluded from completing that preliminary investigation; its only two choices are either to issue a formal charge without any investigation, or to allow a student who may well have raped his fellow students to graduate. This Court allowed this claim to proceed to discovery based on a linguistic ambiguity in Harvard's published procedures. But as the district court explained in detail below, the discovery record precludes Sonoiki's claim. That

record includes the language and structure of the contract materials, the surrounding context, and the parties' own course of conduct, which shows that both parties understood at the time that Sonoiki's degree would be withheld while the complaints against him were being investigated. In light of this record, the district court properly concluded that Sonoiki's current reading of Harvard's procedures is unreasonable.

**B.** Moreover, even if Sonoiki's understanding of Harvard's procedural promises were reasonable, the district court properly concluded that Sonoiki's claim would still fail. That is because it is undisputed that, even if Harvard were not authorized to withhold Sonoiki's degree at graduation, it was certainly authorized to withdraw the degree once it concluded that he had committed sexual assault against multiple fellow students during his time at Harvard. Thus, Sonoiki lacks any right to a degree regardless whether his construction of Harvard's procedures is reasonable, as the district court correctly held.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Watson v. Edmark*, 118 F.4th 456, 459 (1st Cir. 2024).

# ARGUMENT

## I.  THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARDS.

Most of Sonoiki's brief raises factbound arguments concerning the application of Harvard's disciplinary procedures to his case.  But he also appears to argue that the district court applied an incorrect legal framework, objecting to the court's description of the summary judgment standard and to its statement of Massachusetts contract law.  *See, e.g.*, Sonoiki Br. 18-29, 63-64.  Both arguments fail.

Summary Judgment Standard.  The district court recognized and applied the settled summary judgment standard.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  ADD18 (quoting *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014)).  The non-moving party may "defeat summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trial worthy issue persists."  ADD18 (quoting *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006)).  Sonoiki does not quarrel with the district court's statement of this standard.  *See* Sonoiki Br. 63-64.

Where the non-movant bears the burden of proof at trial, the district court then explained, the non-movant must present "definite, competent evidence" to

defeat summary judgment. *Mirabella v. Town of Lexington*, 64 F.4th 55, 57 (1st Cir. 2023) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)); *see* ADD17-18. Such evidence "cannot be conjectural." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

Sonoiki asks this Court to disregard or relax the "definite, competent evidence" requirement. Sonoiki Br. 18-24. He asserts that the standard arises from the employment discrimination context. *Id.* at 18-19. And he contends that this Court declined to apply the definite-and-competent-evidence standard in *Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018), another campus discipline case. Sonoiki Br. 22-24.[6]

Sonoiki is wrong. The definite-and-competence-evidence standard applies in *all* legal contexts, not just employment discrimination. *See, e.g.*, *Deaton v. Town of Barrington*, 100 F.4th 348, 357 (1st Cir. 2024) (Section 1983); *Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 57 (1st Cir. 2024) (negligence); *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 162 (1st Cir. 2016) (consumer protection). It is simply a restatement of the basic point that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

---

[6] Sonoiki also claims that this Court did not apply the standard in *Doe v. Brandeis University*. Sonoiki Br. 22. But that is a district court case, 2023 WL 1822785 (D. Mass. Feb. 8, 2023), that correctly stated the definite-and-competent-evidence standard, *id.* at *7.

that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). And, of course, this Court did not overturn or disregard this standard in *Boston College*. Rather, it allowed a claim to proceed to trial because the non-movant had pointed to specific record facts that created a triable issue of fact. *See* 892 F.3d at 87.

Breach-of-Contract Standard. Sonoiki's contract claim is that Harvard failed to follow the procedures set forth in Harvard College's Student Handbook and Ad Board procedures incorporated by reference in the Handbook. *Sonoiki*, 37 F.4th at 703. Contracts between students and universities are interpreted "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007). The "appropriate inquiry is whether 'the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions.'" *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 316 (1st Cir. 2022) (quoting *Sonoiki*, 37 F.4th at 709). It does not matter "what *plaintiff's* expectations of the proceeding were" if those expectations were not reasonable—it is "an objective reasonableness standard." *Walker v. President and Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 530 (D. Mass. 2014).

The district court properly set forth this legal standard. ADD20. The court also correctly stated the Massachusetts law of contracts. The court explained that

"[t]o defeat Harvard's motion for summary judgment on each theory, Sonoiki must demonstrate a contractual right, breach, and harm." ADD20-21. And the court noted that "as to harm, [Sonoiki] must present evidence showing that the breach committed by Harvard would have 'changed the outcome' of his disciplinary cases." ADD21 (quoting *Doe v. Williams Coll.*, 2022 WL 4099273, at *16 (D. Mass. Sept. 7, 2022)).

Sonoiki resists this legal rule, *see, e.g.,* Sonoiki Br. 20-22, 26-29, but it is unquestionably correct. A breach-of-contract plaintiff in Massachusetts must prove that he "suffered harm as a result" of the breach as an element of his claim. *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016). That rule applies in campus discipline contract cases just as it does in other contexts; the plaintiff must not only demonstrate that his "reasonable expectations were not met because [the university] strayed from the promises made in its" policies, but also that it did so "in ways that harmed his defense and affected the outcome." *Stonehill College*, 55 F.4th at 329. "[R]equiring that any challenged procedural flaw affect the outcome of a Title IX investigation ... provides an apt formulation for assessing the viability of [a plaintiff's] breach-of-contract allegations under Massachusetts law." *Id.* at 329 n.41.

The question, then, is whether after extensive discovery, Sonoiki was able to create a genuine dispute of material fact as to whether this and the other legal

standards set forth above were satisfied.  For the reasons explained directly below, the answer is no.

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON SONOIKI'S DISCIPLINARY-PROCESS THEORIES.

The district court carefully considered Sonoiki's four objections to the way Harvard conducted its disciplinary process, and determined that none of them raised a triable issue.  *See supra* at 16-19.  This Court should affirm.

### A. The Undisputed Facts Refute Sonoiki's Duty-To-Advocate Theory.

**1.** Sonoiki argues that Harvard's governing documents create a reasonable expectation that a student's Board Representative serve as an advocate.  Sonoiki Br. 14-18.  But Harvard's Student Information Form—which sets forth the detailed procedures that govern a disciplinary proceeding before the Ad Board, *see supra* at 11—expressly states that a Board Representative "will not advocate" for the accused student.  SA259.  Harvard's procedural documents also provide that the process is "pedagogical rather than judicial," SA258-59, SA2090, that it is "not a model based on the criminal justice system," SA1643-44, SA2080, and that "attorneys for students are not permitted to participate," SA258-59, SA2090.  Thus, Sonoiki's contention that Laura Johnson, Sonoiki's Board Representative, had advocacy duties akin to an attorney is meritless.

This Court previously held that other language in the Student Information Form created an ambiguity about whether a Board Representative had any advocacy duty. *See Sonoiki*, 37 F.4th at 710-11. Contract language that this Court did not consider, as well as extrinsic evidence produced through discovery, *see Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008) (extrinsic evidence can resolve contract ambiguity), demonstrates that there is no such duty.

As this Court recognized, the Student Information Form states that the Board Representative "represent[s] [the student] to the subcommittee and the Board," "speaks on [the student's] behalf," and "will make certain that [the student's] perspective is clearly presented." SA259, SA2094. All of those statements are true—the Board Representative is the student's liaison to the Board and therefore is meant to clearly present the student's perspective. But presenting the student's perspective can be done objectively; it does not require advocacy. The Student Information Form further says—in language this Court did not address—that the Representative "will present to the Board a *full* summary of the facts of the case" and will "address the [Board] briefly if there are *relevant facts* that [the student and the Board Representative] previously discussed but that [the student] failed to raise in [their Board] interview." SA259-60, SA2094-96 (emphasis added). That express responsibility to pass on *all* relevant facts, even if the student declines to

do so himself, is inconsistent with an advocacy position that would ostensibly only pass on those facts helpful to the student.

The extrinsic evidence confirms the point. For example, Ellison reiterated to Johnson in a May 2013 email that "students are told that the Board representative is *not an advocate* or an adversary *but simply a representative*." SA706-07, SA2126 (emphasis added). Johnson never told Sonoiki she was his advocate. SA1777, SA2127. Instead, she twice recommended to Sonoiki that he should confer with an attorney, SA824-25, SA904, SA2128, SA2135, making clear to him that *she was not his lawyer*.[7] And the fact that Sonoiki did not raise this Advocacy Theory in his appeal of the Ad Board's determination confirms that he shared Harvard's understanding. *See supra* at 13.

Moreover, as the news article cited in Sonoiki's Amended Complaint explains, important amendments to the disciplinary procedures were adopted in 2009—and resulted in the procedures governing Sonoiki's case—precisely because the Board Representative *was not an advocate*, and the College aimed to bolster the role of the "personal adviser" (which Sonoiki chose not to use here) to provide the student with an advocate who is not on the Ad Board.[8] That additional

---

[7] Sonoiki chose not to consult a lawyer, and also did not select a personal adviser to support him in the proceedings. SA2128.

[8] SA112 n.5 (citing Mercer R. Cook & Rebecca D. Robbins, *Ad Board's Advising System Faces Criticism*, The Harvard Crimson (Oct. 24, 2012), https://www.thecrimson.com/article/2012/10/24/Resident-deans-ad-board-role/).

extrinsic evidence further resolves in Harvard's favor any contractual ambiguity about the Board Representative's purported advocacy duty. *See Bank*, 888 N.E.2d at 907.

**2.** Despite all this, the district court concluded that, drawing "all reasonable inferences in favor of Sonoiki," "a reasonable student could conclude that his Board Representative would act as an advocate in some form," ADD23, but that no reasonable student could conclude that this advocacy duty approached anything like an attorney in a judicial proceeding, ADD23.

For the reasons just explained, the relevant procedural documents and extrinsic evidence render the existence of *any* advocacy duty questionable at best. But in the end, this Court need not resolve that question. Sonoiki was able to conduct extensive discovery, which included depositions of Johnson and Ellison, as well as review of extensive document production, including the detailed notes of Richard Cole,[9] the independent investigator who helped lead the Ad Board's investigation and who took notes of every stage of the investigation and Ad Board Proceedings. *See supra* at 11-12. And as the district court properly concluded *even under the advocacy duty it recognized*: no facts supported Sonoiki's contention that Johnson breached that duty, and Sonoiki in any event did not

---

[9] Sonoiki could have deposed Cole, along with others involved in his proceedings, and chose not to.

present any facts showing that he was harmed by any potential breach or that any breach "affected the outcome of one or more of his disciplinary cases." ADD26.

Sonoiki launches five attacks on the district court's holdings. Each lacks merit.

*First*, Sonoiki claims that the district court erred in "distinguishing Johnson's duty to advocate for Sonoiki from her duty to share witness names with him," as well as "in separating Johnson's duty to advocate from her duty to attend initial meetings." Sonoiki Br. 14-15. In fact, however, this Court itself separated out those theories, *Sonoiki*, 37 F.4th at 710-13, and the district court in any event analyzed Sonoiki's claims both individually and "collectively," *see* ADD21-33.

*Second*, Sonoiki contends that Johnson breached her advocacy duty because she "minimized the gravity of [Sonoiki's] situation." Sonoiki Br. 16; *see id.* at 17 (similar). In fact, however, the record demonstrates the opposite. Johnson informed Sonoiki that the charges against him were "more serious" than he had appreciated. ADD8 n.10; *see* SA1726-29, SA1739-40, SA2106-2107. And she repeatedly urged him to "consult an attorney," SA824, SA2128, ███████████████ ███████████████████████████████████████████ *id.*; *see* SA890-91, SA1588, SA1596, SA2134, schedule a meeting to be briefed on the interviews she attended, SA890, SA2133, and so on. *See supra* 12. Sonoiki

rejected all of Johnson's suggestions.  *Id*.  The facts thus do not support Sonoiki's

contention that Johnson minimized his plight.[10]

*Third*, Sonoiki also objects that Johnson "breached her advocacy duty

regarding Sonoiki's written statements."  Sonoiki Br. 17.  Sonoiki cites language in

the Student Information Form stating that an accused student is "encouraged to

share a draft of [his] statement with [his] Board Representative who is well-

positioned to discuss, among other matters, your statement's style, organization,

length, and clarity, while also anticipating questions it may raise for the Board."

SA260.  But as Sonoiki admitted, Johnson in fact *did* review Sonoiki's written

statements and provided feedback on them, SA2027, which satisfied the duty the

Student Information Form imposed.

Sonoiki now complains, however, that Johnson's feedback should have been

more detailed.  Sonoiki Br. 17.  But he has waived that argument by failing to raise

it below, *see Su v. F.W. Webb Co.*, 110 F.4th 391, 396 n.1 (1st Cir. 2024), and it is in

any event meritless.  Sonoiki points to no contractual language showing that a

Board Representative had any duty to offer feedback of any particular form or

volume on any particular document.  Nor does he make any argument or adduce

---

[10] Sonoiki complains about two statements Johnson made: First, that the "issuance
of a charge" is "not a finding"; and second, that the Ad Board's recommendations
are not followed "100% of the time."  Sonoiki Br. 16-17.  But those statements are
true; Sonoiki certainly does not offer any evidence showing otherwise.

any evidence that receiving different feedback from Johnson would have made a difference.

*Fourth*, Sonoiki claims that Johnson breached her advocacy duty because she "took detailed meeting notes, but did not share the notes with Sonoiki." Sonoiki Br. 17. But Sonoiki did not press this point below as part of his advocacy theory, so it is waived here. *See F.W. Webb Co.*, 110 F.4th at 396 n.1.

Moreover, the undisputed evidence shows that Johnson repeatedly offered to share her account of the subcommittee meetings with Sonoiki, who never responded to that offer. Johnson wrote to Sonoiki on August 21, 2013, suggesting that she "report" to Sonoiki on the "extensive notes" she took at the subcommittee meeting. SA387-88, SA2139. She reiterated that offer on September 11, 2013, SA1008, SA2140, and more emphatically on October 15, 2013, telling Sonoiki that she was ███████████████████████████████████████████ ████ SA380-81, SA2141. And on November 17, 2013, Johnson made a final attempt, telling Sonoiki that she ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ SA1089-90, SA2146. But Sonoiki declined Johnson's many offers, telling her at one point that he had ████████ ███████████████████████████ from the witnesses the subcommittee interviewed, SA1005, SA2140, and responding to her November email with a

message reading ███████████████████████████████████████

███████████ SA1089-90, SA2146.[11]  Sonoiki cannot now complain that he did

not receive the information Johnson repeatedly offered to share.  Nor does he

develop any argument for why he had a contractual right to see the notes in writing

rather than as relayed by Johnson.

In any event, the district court correctly explained that Sonoiki was not

harmed from his deliberate decision not to receive a full account of the

subcommittee meetings.  The court noted that "even if this factual assertion could

constitute a breach of Johnson's advocacy duties, Sonoiki has failed to demonstrate

that sharing the notes: (1) would have revealed something he did not already know;

(2) would have resulted in him doing something differently in the course of the

disciplinary process; or (3) otherwise affected the outcome of the disciplinary

process."  ADD24 n.21.  Despite the opportunity to take discovery, including

through deposing Johnson, Sonoiki has never explained how the information he

declined to hear would have helped him.  And on appeal, he responds to this

problem only by suggesting that "a rational jury ... could believe that the notes

contained information relevant to his defense."  Sonoiki Br. 20.  But without any

---

[11] A few days later, Johnson noted in an email to herself that she ████████████
████████████████████████████████████ SA1602, SA2147.

evidence in support of that theory, all that Sonoiki has is "conjectur[e]." *Mack*, 871 F.2d at 181. More is required to defeat summary judgment.

*Finally*, Sonoiki asserts that Johnson had a "conflict of interest" because Johnson expressed in an email to Ellison that she felt "close" to one of the women, Betty, who charged Sonoiki with assault. Sonoiki Br. 16-17, 32-34. The full context of that email is set out in the district court's opinion: Betty (like Sonoiki) was in Johnson's residential house, so Johnson wrote to Ellison that it might be "hard[] for Betty" to have Johnson working with Sonoiki. ADD25 (quoting SA707). Ellison responded that Sonoiki "knows [Johnson] and so far seems to want to work with [her]," and explained that "students are told that the Board representative is not an advocate or an adversary but simply a representative," so Johnson's acting as Sonoiki's Board Representative would not be inconsistent with her relationship with Betty or prevent her from supporting Betty. *Id.* (quoting SA706). Sonoiki asserts that Johnson's supposed "conflict of interest" breached her duty of advocacy as a Board Representative. That is wrong for two basic reasons, as the district court correctly concluded.

First, no contractual provision could create a reasonable expectation that a Board Representative would not have a "conflict" in the sense that Sonoiki describes—i.e., a close relationship to another student involved in the proceedings. A student's Board Representative is presumptively his resident dean, who is close

to all the students in the same residential house. SA237-39. And again, the Board Representative is not an attorney, and the Ad Board proceeding is "pedagogical rather than judicial," SA259-60, SA2090, "not a model based on the criminal justice system," SA1642-43, SA2080. Sonoiki is suggesting a Board Representative with an unyielding fiduciary duty to the student she represents and no duties to anyone else, which is simply inconsistent with the structure of the Ad Board proceedings and students' reasonable understanding of university administrators.

The extrinsic evidence confirms the point. When Johnson raised her concern to Ellison, he responded (as Secretary of the Ad Board) that the concern was unfounded precisely because "students are told that the Board representative is not an advocate or an adversary but simply a representative." SA706. For Sonoiki's part, he indisputably knew that Betty was in Johnson's residential house and in fact knew that Johnson had been Betty's Board Representative in a prior, unrelated Ad Board proceeding, SA1713-14; *see* SA1619 (noting that Sonoiki ██████████████████████████████████████ yet selected Johnson as his Board Representative anyway. This consistent, contemporaneous understanding of the Board Representative's role from both Harvard and Sonoiki confirms that Harvard's policies did not create any reasonable expectation that a Board

Representative would not have a close relationship with other students involved in the disciplinary proceeding.

Second, and in any event, the district court correctly concluded that Sonoiki "has pointed to no evidence showing that Johnson breached her duties as his Board Representative" because of the alleged conflict. ADD25. Sonoiki appears to concede in his briefing that he has not identified any such evidence, despite deposing Johnson and obtaining numerous documents. Instead, he posits that Johnson's alleged conflict of interest constitutes a "structural error" such that the harm requirement should be excused. Sonoiki Br. 33. That is wrong. Harm from any asserted breach is an element of contract damages in Massachusetts, *supra* at 26-27, and Sonoiki cites no case adopting a "structural error" exception. Instead, he seeks to "distinguish[]," Sonoiki Br. 36, the Supreme Court's decision in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which held in the Sixth Amendment context that a defendant must point to actual harm from an asserted conflict, *id.* at 350, and which the district court included as a "cf." cite, ADD25. If anything, Sonoiki has it backwards—if a potential conflict of interest does not even suffice to undermine a *criminal conviction*, it certainly cannot interfere with a non-judicial, pedagogical university disciplinary proceeding. In any event, this is a contract dispute, not a constitutional case, and no contract law principle supports Sonoiki's structural-

error argument.  Thus, because Sonoiki has not shown that Johnson's asserted closeness with Betty caused Sonoiki any harm, his conflict-of-interest theory fails.

## B. The Undisputed Facts Refute Sonoiki's Breach-Of-Confidentiality Theory.

The district court next rejected Sonoiki's claim that Johnson breached "a duty to keep their conversations confidential."  ADD27; *see supra* at 16-17. Drawing all inferences in Sonoiki's favor, the court concluded that a confidentiality duty existed, but held that Sonoiki "fails to show that Johnson breached her duty." ADD27.  The court separately held that Johnson had not offered evidence that he was harmed by the supposed breach.  ADD28.  The district court was wrong that there was any confidentiality duty at all, but its ultimate conclusion that there was no breach of any such duty was correct and should be affirmed.

**1.**  This Court previously held that whether Sonoiki even plausibly alleged a duty of confidentiality was a "close call" under the relevant procedural documents. *Sonoiki*, 37 F.4th at 711.  After discovery, any ambiguity on that front has been eliminated.

For one thing, the Student Information Form's description of the Board Representative's duties contradicts any possible confidential relationship.  Again, the Board Representative "will present to the Board a *full* summary of the facts of the case" and will "address the [Board] briefly if there are relevant facts that [the student and the Board Representative] previously discussed but that [the student]

39

failed to raise in [their] interview," SA259-60, SA2094-96 (emphasis added). A responsibility to disclose all relevant facts whether or not a student does so is incompatible with a confidential relationship.

The extrinsic evidence again confirms this point. Harvard told Sonoiki that Johnson would share Sonoiki 's communications with the Board, disabusing him of any notion of confidentiality. In an October 30, 2013 email, Ellison advised Sonoiki that Johnson ███████████████████████████████████████████ ███████████████ SA1082, SA2142-43 (emphasis added). And when asked whether she encouraged students to be honest and forthcoming with her, Johnson testified that she ██████████████████████████████████████████ ██████████████████████████████████████ SA1605, SA2143 (emphasis added); *see also* SA1605, SA2144 ████████████████ █████████████████████████████████████████████

Sonoiki, for his part, did not treat his communications as confidential—he routinely copied Ellison on emails to Johnson, *see* SA1860-61, SA2144,—and as with the other arguments raised here, he never suggested any confidentiality violations in his appeal to the Faculty Council, SA1420-27, SA2152.

Finally, there is the matter of common sense. *See Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir. 2001) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons."). A Board

Representative is a *member of the Ad Board* who serves as a student's liaison to the Board, and whom the Student Information Form describes as an "officer of the College." SA259, SA2093-94. Under Sonoiki's argument, if a student told their Board Representative—again, a member of the Ad Board and officer of the College—that they had sexually assaulted another student, or plagiarized a paper, then the Board Representative must remain silent and inform no one. That is nonsensical.

**2.** In any event, the district court was right that Sonoiki never offered any evidence of a breached confidentiality duty. ADD27-28. Sonoiki was asked at deposition whether Johnson had failed to keep his confidence in any respect. SA1795, SA2144. He admitted that he "d[id]n't know" of any such instance, even after receiving voluminous document discovery and deposing Johnson. *Id.* At one point during his deposition, Sonoiki did attempt to identify one potential disclosure he believed breached this duty, but then had to concede that he shared *this exact information* with both Johnson *and* Ellison—the Ad Board Secretary— demonstrating that Sonoiki himself did not treat this information as confidential. *See* ADD28. Sonoiki thus cannot establish that Johnson breached any duty, much less that he was harmed by a breach.

Sonoiki has little to say in response. *See* Sonoiki Br. 59-61. He does not point to any evidence that breach of confidentiality occurred. Instead, he claims

that a jury could "infer[] that Johnson may have breached confidentiality" because she "did not state that she never did so" and was "close[] to Betty." *Id.* at 60. But to survive summary judgment on this question, Sonoiki must point to "definite, competent evidence"—not mere conjecture—that a breach occurred and that he was harmed by the breach. *Mirabella*, 64 F.4th at 57 (quotations omitted); *see supra* at 25-26. He cannot satisfy that standard.

## C. The Undisputed Facts Refute Sonoiki's Witness-Name Theory.

The district court also rejected Sonoiki's theory that "Harvard breached the contract because Johnson failed to give him the names of all witnesses who provided evidence to the Ad Board." ADD29; *see supra* at 17. The district court correctly rejected this argument. ADD30. That conclusion should be affirmed for several reasons.

*First*, Sonoiki indisputably knew the witness names. After all, he identified witnesses by name in his written response to the Subcommittee report. SA942-43, SA947, SA1151, SA2138, SA2149. Laura Johnson indisputably told him the names of at least some witnesses. SA942-43, SA947, SA2138. And contemporaneous notes of Sonoiki's interview with the Ad Board's investigator, Richard Cole, demonstrate that Cole and Sonoiki discussed the witnesses by name. SA949, SA966, SA981, SA1099, SA1162, SA1234, SA2138-39. Indeed, Sonoiki's complaint alleges only that the *Subcommittee*—i.e., the subgroup of the

Ad Board—did not itself tell him the names of witnesses.  SA148.  That is also what his declaration below said:  ███████████████████████████████ ████████████████████████████████████████████  SA2054.  But even if that is true, it is irrelevant—he knew the witness names, which is all that matters.

*Second*, even if Sonoiki had a plausible argument that he did not know witness names, that is his own fault, not Harvard's.  At the very beginning of the investigations, Ellison told Sonoiki that while witness names are redacted by the Ad Board for privacy reasons, Johnson ████████████████████████████ ██████████████████████████  SA850, SA2129; *see also* SA856, SA2130 (similar).  Yet Sonoiki did not ask Johnson to share the witness names.  Moreover, as explained above, Johnson implored Sonoiki on numerous occasions to meet with her to learn more about his case, including witness interviews, but he repeatedly declined.  *See supra* at 34-35.

*Third*, as the district court concluded, Sonoiki has pointed to nothing in the record suggesting that learning the names of witnesses would have altered the proceedings' course.  Even if Sonoiki did not know the witness names before, he learned them through discovery.  ADD30.  So if knowing those names earlier mattered in any way, Sonoiki has had ample opportunity to develop the relevant facts.  Sonoiki has no response to this point.  Instead, he "restates and

incorporates" his various erroneous theories about why he need not show harm, and why a jury could rule in his favor based on conjecture. Sonoiki Br. 31.

*Fourth*, Sonoiki again never raised the fact that he did not know witness names either during the Ad Board proceedings or his appeal, further demonstrating that this is a made-for-litigation position, not a breach of contract.

### D. The Undisputed Facts Refute Sonoiki's Initial-Meeting Theory.

The district court next rejected Sonoiki's claim that Johnson breached an asserted duty to attend an initial meeting "between the student, his or her Resident Dean, and the Secretary of the Administrative Board or his or her designee." ADD31; *see supra* at 17-18. But Johnson *did* attend his initial meeting, and Sonoiki cannot articulate any harm he suffered in any event, which is presumably why Sonoiki again failed to raise this fabricated issue before the Ad Board or in his administrative appeal.

*First*, Johnson indisputably attended the June 3, 2013 initial meeting to discuss Ann and Cindy's sexual-assault complaints. The calendar invitation for the meeting listed Johnson as a participant. SA704, SA2117. Johnson asked Ellison how to call into the meeting and received the call-in information. SA308, SA696, SA830, SA1558-59, SA2117. Both Johnson and Ellison testified that Johnson was present at the meeting, SA 308, SA1558-59, and Ellison signed a form on the date of the meeting indicating that he met with Sonoiki

"[a]ccompanied by" Johnson, SA830, SA2117. In contrast, Sonoiki testified only that he did not recall whether Johnson attended the meeting. SA1769, SA2118. And even if Sonoiki had definitively asserted that Johnson was not there, such "conclusory, self-serving testimony" would not create a material dispute of fact, particularly where it is contradicted by contemporaneous documentary evidence. *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 20 (1st Cir. 1999); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (no dispute of fact at summary judgment "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record").

*Second*, as the district correctly concluded, Sonoiki has not "provided any evidence suggesting that he suffered harm" from Johnson's supposed absence from his initial meeting. ADD32. Sonoiki himself said that he "d[id]n't know" whether anything would have changed had Johnson been present at that meeting. SA1770, SA2118. That is because nothing could have changed: Sonoiki spoke to Johnson repeatedly throughout the process, *see supra* at 34-35, and there is no evidence that her presence at one additional meeting would have yielded a different result. And while Sonoiki now claims that the initial meeting "was crucial for Sonoiki to learn about the allegations, understand relevant rules, and formulate his defense," Sonoiki Br. 58, it is undisputed that Ellison explained Harvard's disciplinary process, which was the goal of the initial meeting. SA423, SA1552, SA1725-27,

SA2105.  It is no surprise, then, that Sonoiki identifies no information that he should have received but did not.  Instead, he simply reiterates his meritless objection to the requirement that he prove harm.  Sonoiki Br. 58-59.

### E.    The Undisputed Facts Refute Sonoiki's Cumulative-Error Theory.

Sonoiki's final process-related argument relates to the district court's conclusion that, "even when his theories are considered collectively, Sonoiki has failed to establish harm and thereby failed to sustain his breach of contract claim." ADD33.  Relying on this Court's decision in *Doe v. Stonehill College, Inc.*, 55 F.4th 302 (1st Cir. 2022), Sonoiki argues that the district court erred in that assessment.  But *Stonehill College* holds only that procedural errors can cause harm "cumulatively" even if they are harmless individually, and that cumulative harm was adequately alleged in the complaint in that case.  55 F.4th at 329.  The district court here correctly recognized this principle, but held on the actual record that there was no cumulative harm.  ADD33.  Sonoiki offers nothing to challenge that careful assessment.

## III.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON SONOIKI'S DEGREE THEORY.

Sonoiki's final breach-of-contract theory is that Harvard had no authority to withhold his degree while it investigated pre-graduation complaints by students alleging that Sonoiki had sexually assaulted them.  As the district court correctly

held, Sonoiki's argument is unreasonable under Harvard's written policies, especially when viewed in light of context and extrinsic evidence.

### A. Sonoiki's Assertion That Harvard Had No Right To Withhold His Degree While It Investigated The Sexual Assault Complaints Against Him Is Unreasonable, As The District Court Correctly Concluded.

Sonoiki does not dispute that if the complaints against him were true—i.e., if he did in fact sexually assault other students while matriculated at Harvard—he would have been in grave violation of Harvard's disciplinary rules and would not have any right to a degree. ADD34-35. Harvard's written procedures establish a rigorous process for determining whether such allegations are true: a complaint triggers the opening of a disciplinary "case," which starts with a preliminary investigation by a Subcommittee of the Ad Board. SA257-63. If the Subcommittee finds that the alleged facts, if true, would result in a violation of the code of conduct, it will then recommend that a formal "charge" issue. SA238. Only if a charge is issued does a more in-depth Ad Board investigation commence. *Id*. That investigation then concludes with a determination of the Ad Board about whether the violation in fact occurred, and if so what discipline is appropriate. SA238-39.

Sonoiki does not dispute that Harvard followed this process here. But he argues that Harvard was nonetheless foreclosed from withholding his degree— even though two complaints of serious misconduct were made against him before

graduation—because Harvard was not authorized to investigate those complaints under its ordinary process. Rather, Harvard was (according to Sonoiki) required to either (i) dispense with any preliminary investigation and formally charge him upon receipt of the complaints, or else (ii) grant him a degree—even if an investigation would reveal the complaints to be true and that he sexually assaulted multiple fellow students before graduation. That is as wrong as it sounds.

The Student Information Form, which governs student discipline cases before the Ad Board, states without qualification that "[a] student *cannot* receive a degree before a pending *disciplinary case* is resolved." SA263, SA2091 (emphasis added). It further states that "a disciplinary case always begins with an *allegation* of student misconduct in the form of a complaint or report." SA257-58, SA2091 (emphasis in original). Taken together, these provisions mandate that Harvard cannot grant a degree to a student against whom a misconduct complaint has been filed until it investigates. It is undisputed that two of the complaints here were filed against Sonoiki before the May 30, 2013 graduation day.

Throughout these proceedings, Sonoiki's only response has been the following provision from the overview of the Ad Board in the Student Handbook ("Ad Board Overview"): "Students are expected to comply with all disciplinary rules from matriculation until the conferring of the degree. A degree will not be granted to a student who is not in good standing or against whom a disciplinary

charge is pending." SA239, SA418, SA1554, SA2109-10. The first quoted sentence would preclude Sonoiki from graduating if the allegations against him were true. But according to Sonoiki, the second quoted sentence means that Harvard cannot withhold a degree from a student accused of violating the disciplinary rules unless it has issued a formal "charge" before graduation without conducting any preliminary investigation.

This Court held at the pleadings stage—where it "indulge[d] every reasonable inference hospitable to [Sonoiki's] case," including "with respect to determining what a student may have reasonably expected terms in the [contract] to mean," *Sonoiki,* 37 F.4th at 709 (quotations omitted), and without determining whether ordinary canons of construction resolve any ambiguity, *see id.*—that these documents created sufficient ambiguity to get past the pleadings. But Sonoiki has now taken discovery, and he must demonstrate his entitlement to a degree based on the contract documents and his reasonable expectations, as the district court correctly determined. ADD23; *see also Gibson Found., Inc. v. Norris*, 88 F.4th 1, 11 (1st Cir. 2023) (contract plaintiff has burden of proving "that the defendant breached its duties under its contractual agreement" (citation omitted)). He cannot make that showing for several reasons.

**1.** While this Court's pleadings-stage decision did not apply any canons of contract construction, such canons are routinely used to resolve contract

ambiguities.  *See, e.g.*, *In re Minkina*, 79 F.4th 142, 147 (1st Cir. 2023).  And here, every tool of construction shows that the contractual documents (i.e., procedural forms) allow Harvard to withhold a degree once a disciplinary case is commenced (i.e., a complaint is filed) until that case is resolved, just as the Student Information Form that governs student disciplinary proceedings states.  *See supra* at 48.

*First*, it is a "well settled" principle of Massachusetts law that contract documents "should be read harmoniously" whenever possible.  *Happ v. Corning, Inc.*, 466 F.3d 41, 46 (1st Cir. 2006).  Thus, if the Student Information Form and Ad Board Overview can be read harmoniously, they should be.  If Sonoiki's reading of the Overview language were right, it would conflict with the Student Information Form.  Sonoiki's reading is that a degree cannot be withheld unless a formal *charge* has been issued before graduation, whereas the Student Information Form expressly states that a degree is withheld once a complaint is filed, before there is a preliminary investigation or formal charge.  But that reading is not reasonable; certainly, it is not so clearly correct as to require disharmony between the Overview and the Student Information Form.

That is because the Overview does not purport to provide the exclusive circumstances under which a Harvard degree will be withheld.  The Overview says that a "degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending"; it nowhere provides that all other

students have an entitlement to receive their degrees.  Other governing documents can provide other, additional circumstances in which a degree may be withheld.  And the Student Information Form provides one such circumstance—a degree cannot issue once a complaint has been filed.  *See supra* at 48.  Basic rules of contract interpretation require these provisions to be read to coincide, not conflict.  And that is especially true here, where the two documents work seamlessly together—the Overview provides the general rule that a degree may not issue when a charge is pending, and the Student Information Form directs that the Ad Board will first conduct a preliminary investigation before determining whether a charge is justified.  Indeed, Sonoiki's position would have required Harvard either to violate its own disciplinary procedures (which provide for a preliminary investigation before a formal charge) or the very Overview on which he relies, which unequivocally states in the sentence just before the one on which he relies that "[s]tudents are expected to comply with all disciplinary rules from matriculation until the conferring of the degree."  *See supra* at 48.

*Second*, even assuming tension between the Student Information Form and the Overview, the former must control under basic interpretation principles.

The Student Information Form controls pursuant to the rule that the specific controls the general.  *See Astra USA, Inc. v. Bildman*, 914 N.E.2d 36, 55 (Mass. 2009).  The Overview is "a brief introduction" to the Ad Board generally, SA235,

SA2086, whereas the Student Information Form is a detailed explanation of a disciplinary case from start to finish, SA304, SA254, SA2088-89.  The Student Information Form is far more specific about the rules applicable in disciplinary cases and controls the more general Overview in the case of any conflict.

Moreover, the documents themselves, and the relevant extrinsic evidence, confirm the point.  The Overview expressly states that it provides an overview of the process, and that students should look on the Ad Board's website for more details.  SA235, SA2088 ("For a more detailed description ... visit the website of the Administrative Board at www.adboard.fas.harvard.edu").  The Student Information Form was the document on the Ad Board's website that described the details of the disciplinary case process involving sexual misconduct.  SA254.  That is why Ellison sent Sonoiki the Student Information Form (not the Overview) and went over the Student Information Form (not the Overview) in detail with Sonoiki during their initial meeting.  *See supra* at 9.  There is no dispute that both Harvard and Sonoiki understood that the Student Information Form controls the details of the disciplinary case process.  SA125-26, SA1764-65, SA2122.

*Third*, contract language must be read in light of the contract "as a whole" rather than "in a vacuum," *Minturn v. Monrad*, 64 F.4th 9, 15-16 (1st Cir. 2023), and Sonoiki's interpretation runs afoul of other contract language.  As the district court explained, the "structure of the contract provides that a student earns a degree

at the end of the contract term, after fulfilling the conditions precedent required by the contract," ADD40—including that the student not sexually assault fellow classmates. Again, the sentence in the Overview directly before the one on which Sonoiki relies makes that express point: "Students are expected to comply with all disciplinary rules from matriculation until the conferring of the degree." SA239. Moreover, in disciplinary cases like this one, "the contract provides an extra measure of process by providing for an initial, more limited investigation prior to the charge." ADD45 (citing SA259). "Deferring award of the degree, as Harvard did, pending the outcome of the disciplinary proceedings comports comfortably with these other contract terms." *Id.*

Sonoiki's construction, in contrast, does not. As the district court carefully explained, the contract required Sonoiki to comply with the disciplinary rules "as a condition precedent to receiving a degree" and "empowered Harvard to determine whether Sonoiki did so and, if not, the consequences to impose." *Id.* "Sonoiki's construction of the contract either removes a condition precedent to the conferral of a degree (i.e., Harvard certifying compliance with the conduct rules up to commencement) or requires omitting the very process Harvard established for peer disputes (i.e., the two-phase approach that begins with a limited initial investigation)." ADD40-41.

**2.** These ordinary textual canons suffice to resolve any ambiguity, but as the district court's detailed analysis explains at length, common sense, context, and the parties' course of conduct confirm the point. *See Bank*, 247 F.3d at 302 ("Common sense is as much a part of contractual interpretation as is the dictionary or the arsenal of canons."); *McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 299 (1st Cir. 2004) ("Contract interpretation under Massachusetts law depends heavily on context and recognizes that words can have different meanings in different contexts."); *Bank*, 888 N.E.2d at 910 n.21 (course of conduct can resolve contractual ambiguities).

On Sonoiki's theory, if a student is alleged to have committed a serious disciplinary offense such as sexual assault just before graduation, Harvard has only two choices: (i) grant him a degree, despite the possibility that he may not be entitled to one, or (ii) issue a formal charge immediately without taking any steps to investigate. As the district court properly concluded, "[n]o reasonable student confronted with this set of circumstances would read the one sentence Sonoiki highlights (or the entire contract) in the manner he urges." ADD41. As the district court further explained:

> The first path would defeat two important substantive purposes of the contract: to ensure that students comply with conduct rules throughout their entire time at Harvard, and to ensure that Harvard degrees accurately certify that fact. The second path harms respondent students who ordinarily benefit from the slower, more careful process resulting from both a preliminary and final investigation. Indeed, not all complaints filed by students result in

charges.  An objectively reasonable student would not fairly understand the contract as requiring either result that follows from Sonoiki's interpretation. ADD42.  It is Sonoiki's reading, not Harvard's, that "leads to implausible scenarios."  Sonoiki Br. 42.

Finally, the parties' course of conduct demonstrates beyond doubt that at the time, the parties both understood that Harvard had the authority to withhold Sonoiki's degree while it investigated the complaints against him.  As explained above, the undisputed evidence demonstrates that Ellison informed Sonoiki in advance of graduation that he would not be granted a degree while the complaints against him were being investigated, *see supra* at 9, which demonstrates Harvard's consistent understanding of its contractual authority.  That consistent understanding is further underscored by Ellison having notified the governing boards not to vote on Sonoiki's degree in light of the complaints filed against him.  *See id.*

Sonoiki now argues that Harvard would have "place[d] [him] on leave" if it believed the charges against him were serious enough to withhold a degree, Sonoiki Br. 45, but that makes no sense: the school year was already over when the complaints against Sonoiki were filed, and in any event, the complaints were at the time just that—complaints that had not yet been investigated.  And while Sonoiki relies on the fact that "Harvard did not bar Sonoiki from speaking on Class Day" or "from participating in graduation activities," Sonoiki Br. 46, the district court cogently explained why that approach balanced the need to investigate the grave

accusations against Sonoiki with a desire to avoid publicly embarrassing him while that investigation was occurring, ADD44-45.

Indeed, while Sonoiki now claims that he expected to receive a degree despite the unresolved serious complaints against him, he did not object then, or at any other point during the process, nor did he ever argue that Harvard was obligated to grant him a degree because no charge had issued before graduation. Indeed, he did not even raise this issue in his appeal of the Ad Board's decision, despite his right to raise any "procedural" issue at that time. SA140, SA266, SA1404-47, SA2103, SA2152. Sonoiki understood full well that he would not receive a degree on Commencement in light of the complaints against him—his supposed contrary reasonable expectation is merely a position taken for purposes of this lawsuit.[12]

---

[12] Sonoiki asserts that all contractual ambiguities "become[] a question of fact for the jury." Sonoiki Br. 39. But this Court "has often affirmed entry of summary judgment in contract cases" where there are "no material disputes as to extrinsic facts." *McAdams*, 391 F.3d at 299. And, while Sonoiki claims that the "principle of *contra proferentem*" bears on this case, Sonoiki Br. 39, that principle arises only as a "last resort" where other tools for resolving ambiguity—like contextual analysis—are not availing, *see Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc.*, 233 F.3d 1, 4 (1st Cir. 2000) (applying Massachusetts law). Thus, *contra proferentem* is not relevant here.

## B. The Undisputed Facts Show That Sonoiki Has No Present Contractual Right To His Degree In Any Event.

Thus, Sonoiki's understanding of Harvard's authority to withhold a degree is unreasonable. But in the end, it does not matter because, as the district court correctly held, "Harvard was free to proceed with a post-commencement revocation identical to the proceeding it conducted." ADD36-37. The undisputed facts show that Harvard has authority to revoke graduates' degrees and has done so in the past. SA311, SA2103-04. So Harvard did not "los[e] jurisdiction to adjudicate the complaints against" Sonoiki when he graduated. ADD36. Thus, even if Harvard had been required provisionally to give Sonoiki a degree at graduation, it obviously could not allow a student to keep the degree if he was found after investigation to have sexually assaulted three students.

Sonoiki musters no cogent objection to this holding. He stresses that the Ad Board exercises jurisdiction over students, not graduates. Sonoiki Br. 54. But the undisputed fact is that Harvard's Faculty of Arts and Sciences, acting through the Faculty Council—the same body that ultimately dismissed Sonoiki from Harvard—retains jurisdiction to revoke Harvard degrees. SA311, SA2103-04. Equally important, Sonoiki has no explanation for the basic absurdity of his theory. If Harvard learned the day after graduation that a student had plagiarized every paper she wrote, Harvard would not be powerless to revoke that student's degree.

The fortuity of when Harvard learns of serious misconduct does not determine Harvard's ability to decide who is entitled to hold a Harvard degree.

Sonoiki's fallback argument is incoherent. He says that even if Harvard could have revoked his degree, he had sought a "hedge fund opportunity" in May 2014, before Sonoiki's administrative appeal was resolved, and if he had his Harvard degree on that date, he might have "started at the fund," Sonoiki Br. 55, rather than continuing to work at Goldman Sachs where he was then employed. But Sonoiki's argument has always been that Harvard is required to grant him a degree now because it had no jurisdiction to withhold his degree at graduation. *See, e.g.*, SA2. The fact that Harvard could have revoked his degree after graduation for the very conduct he was found to have committed destroys that argument. And in any event, the decision to withhold Sonoiki's degree was made by the Ad Board in November 2013. *See supra* at 13. He unsuccessfully appealed that decision in May 2014, but Sonoiki does not explain how having his degree revoked for multiple sexual assaults subject to appeal would have helped him get a hedge fund job.

## CONCLUSION

The Court should affirm the judgment below.

Dated: January 6, 2025           Respectfully submitted,


VICTORIA L. STEINBERG                   /s/ *Anton Metlitsky*
CLOHERTY & STEINBERG LLP        ANTON METLITSKY
One Financial Center                    DAVID COHEN
Suite 1120                         O'MELVENY & MYERS LLP
Boston, MA 02111               1301 Avenue of the Americas
(617) 481-0160                Suite 1700
                                New York, New York 10019
                                (212) 326-2000

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 12,943 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared using Microsoft Word in Times New Roman, a proportionally spaced typeface, and 14-point font.

 Dated: January 6, 2025                          /s/ *Anton Metlitsky*
                                                 Anton Metlitsky

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, in addition, one copy was sent to the below via express mail.

Damilare Sonoiki
7627 Aimua Court
Houston, TX 77083

Dated: 01/06/2025                    */s/ Anton Metlitsky*
                                     Anton Metlitsky

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

Order on Defendants' Motion for Summary Judgment, filed February 6,
   2024 ................................................................................................... ADD1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAMILARE SONOIKI,<br><br>            Plaintiff,<br><br>v.<br><br>HARVARD UNIVERSITY et al.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)        Civil No. 19-12172-LTS<br>)<br>)<br>)<br>)<br>) |

<u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 143)</u>

February 6, 2024

SOROKIN, J.

Plaintiff Damilare Sonoiki sued Harvard University, Harvard University Board of Overseers, and the President and Fellows of Harvard College (collectively, "Harvard"), alleging various claims arising out of his dismissal from Harvard College. Doc. No. 1. At the outset, the Court notes that the best practices for college disciplinary proceedings involving allegations of sexual assault have generated substantial dispute and many judicial decisions. In 2013, when Harvard resolved several student complaints of sexual misconduct against Sonoiki, its governing procedures in no way mirrored the types of procedures governing criminal trials in the United States.[1] Harvard's then-governing procedures also in no way mirrored the types of procedures typically applied to resolve civil litigation. Whatever challenges Sonoiki may have advanced to Harvard's written procedures, such challenges are not now before the Court. They were dismissed at an earlier stage in the litigation, in a decision the Court of Appeals affirmed with

---

[1] Of course, the range of consequences available to Harvard also did not include imprisonment.

ADD1

respect to Sonoiki's basic fairness and other claims. What remains are his contentions that Harvard did not accord him the specific protections established in the Harvard Student Handbook ("Handbook"), and that the Handbook entitled Sonoiki to his degree on May 30, 2013, despite the pendency of two allegations of rape or sexual assault made against him two days earlier. The Court resolves those two issues.

Now pending before the Court is Harvard's motion for summary judgment. Doc. No. 143. For the reasons stated below, the Court ALLOWS Harvard's motion.

I.   PROCEDURAL HISTORY

Sonoiki filed this suit against Harvard in federal court in 2019, alleging claims for breach of contract, denial of basic fairness, breach of the covenant of good faith and fair dealing, and estoppel and reliance. Sonoiki v. Harvard Univ., No. 19-12172, 2020 WL 3416516, at *1 (D. Mass. June 22, 2020) (Casper, J.). Harvard moved to dismiss all claims. Id. The District Judge to whom this case was originally assigned allowed Harvard's motion. Id.

Sonoiki appealed. The Court of Appeals for the First Circuit vacated the dismissal of Sonoiki's breach of contract claim, holding that Sonoiki had pled five plausible theories of breach of contract. Sonoiki v. Harvard Univ., 37 F.4th 691, 696 (1st Cir. 2022). It affirmed the dismissal of Sonoiki's other claims and remanded the case for further proceedings.[2] Thereafter, Sonoiki amended his complaint to conform to the Circuit's ruling, Doc. No. 63, and the parties completed fact and expert discovery. Harvard now seeks summary judgment. Doc. No. 143. The motion is fully briefed, and the Court heard oral argument on December 20, 2023. Doc. No. 185.

---

[2] After the issuance of the mandate, this case was randomly reassigned to the undersigned District Judge. Doc. No. 54.

ADD2

II.     FACTS

The Court recites the facts here consistent with the summary judgment standard. In doing

so, the Court views the facts in the light most favorable to Sonoiki, the nonmoving party,

resolves all factual disputes in his favor, and draws all reasonable inferences in his favor. See,

e.g., Alston v. Town of Brookline, 997 F.3d 23, 35 (1st Cir. 2021).

A.      Harvard's Rules and Disciplinary Structure

The Handbook establishes conduct rules and disciplinary procedures that apply to all

Harvard College students. Doc. No. 146-2 at 2. It states: "Students are expected to comply with

all disciplinary rules from matriculation until the conferring of the degree." Doc. No. 146-4 at 8.

Among the specific conduct rules governing students, the Handbook prohibited rape, sexual

assault, and other sexual misconduct, providing:

> The Faculty of Arts and Sciences will not tolerate sexual misconduct including rape
> and other forms of sexual assault . . . . A student who commits rape, sexual assault,
> or other sexual misconduct is subject to severe penalties under the rules of the
> Faculty of Arts and Sciences. Rape and sexual assault are serious crimes under the
> laws of the Commonwealth of Massachusetts and the individuals responsible for
> such acts are subject to prosecution and legal penalties.

Doc. No. 146-3 at 5.[3] The Handbook defined rape as:

> Any act of sexual intercourse that takes place against a person's will or that is
> accompanied by physical coercion or the threat of bodily injury. Unwillingness may
> be expressed verbally or physically. Rape may also include intercourse with a
> person who is incapable of expressing unwillingness or is prevented from resisting,
> as a result of conditions including, but not limited to, those caused by the intake of
> alcohol or drugs. Rape includes not only unwilling or forced vaginal intercourse,
> but also the sexual penetration of any bodily orifice with a body part.

Id. at 5–6.

---

[3] The Court recites the rules and procedures as they are stated in the 2012–2013 Handbook,
because the complaining students filed formal disciplinary cases against Sonoiki in May and
June of 2013. No party has suggested that the rules or procedures differed materially at any
earlier point in Sonoiki's Harvard career.

Students violating these conduct rules face investigation and discipline by the Administrative Board ("Ad Board"), Doc. No. 146-6 at 2, as well as possible further consequences from the Faculty of Arts and Sciences.[4] Doc. No. 146-7 at 8. The Ad Board employs a particular process for students accused of wrongdoing by peers. Doc. No. 164-11 at 4; Doc. No. 146-7 at 2–8. Investigations of this type are divided into two phases. First, an independent fact finder and a subcommittee of the Ad Board conduct an initial review to determine whether a full investigation is warranted. Doc. No. 162-1 ¶ 4; Doc. No. 146-7 at 4–5. This initial review usually includes an interview with the complainant student and the respondent student—though the fact finder and subcommittee may also interview other witnesses at their discretion. Doc. No. 146-7 at 4–5. If the fact finder and subcommittee determine that further investigation is warranted, they make a recommendation to the full Ad Board, id. at 6, which can issue a formal charge against a respondent student by a majority vote, id. at 8.

A majority vote by the full Ad Board triggers a second stage of the investigation, which involves additional witness interviews and further interviews with the complainant student and the respondent student. Id. The subcommittee eventually issues a Disciplinary Case Report, which describes the facts and circumstances of a case and may include a recommendation for disciplinary action. Id. The Ad Board then votes to determine whether the student violated the governing rules and, if so, the appropriate disciplinary action. Id. at 7. In the most serious cases of misconduct, the Ad Board may require a student to withdraw from Harvard College for a period of time along with a recommendation to the Faculty Council that it dismiss or expel the student from the College. Id. at 8. Any student required to withdraw for more than one term can

---

[4] The Faculty of Arts and Sciences acts via its governing body, the Faculty Council. The Faculty Council is composed of the Dean of the Faculty and eighteen elected voting members of the faculty. Doc. No. 146-5 at 2.

appeal the Ad Board's decision to the Faculty Council. Doc. No. 146-8 at 2. A student can also object before the Faculty Council to an Ad Board recommendation of dismissal or expulsion. The Faculty Council is the body responsible for dismissing students from Harvard College. Id.

      B.    <u>Sonoiki Matriculates at Harvard College</u>

In 2009, Damilare Sonoiki started at Harvard College as a freshman. Doc. No. 162-1 ¶ 1. At that time, Harvard published a yearly Handbook and made the Handbook available to all students. Id. ¶ 10.

Sonoiki succeeded during his first two years at Harvard. In his classes, he earned As and Bs. Doc. No. 145-7 at 7. Outside of class, he served as the President of the Harvard Black Men's Forum. Id. at 14. He also had an active social life and was invited to join the exclusive Phoenix Club.[5] Id. at 34.

In September 2011, at the start of his third year at Harvard, Sonoiki attended a Phoenix Club party where he encountered an acquaintance, a fellow Harvard College student named Ann.[6] Id. at 34. After some conversation, they left the party together. Id. at 14. The pair ultimately ended up in Sonoiki's dorm room, where they had sexual intercourse. Id. at 14. Much later, the two would describe the intercourse differently; he said it was consensual, while she described awaking from a blackout to find him penetrating her.

About a month later, in October 2011, Ann told a friend about what had happened with Sonoiki. Id. at 67. The friend asked Sarah Rankin, who was then the Director of the Office of Sexual Assault and Response at Harvard, to reach out to Ann. Id. at 78. Rankin, in turn, emailed

---

[5] The Phoenix Club featured prominently in director David Fincher's film, <u>The Social Network</u> (Columbia Pictures 2010).
[6] Consistent with the parties' submissions and prior court opinions in this case, this Court will use pseudonyms when referring to the women who accused Sonoiki of misconduct.

Ann suggesting they talk. Id. at 77. Although the two exchanged a few short emails, no meeting occurred between Ann and Rankin for many months. Id. at 12.

In June 2012, Ann met with Rankin and discussed her experience with Sonoiki. Id. Ann did not then file a complaint with the Ad Board. Ann told Rankin that she did not wish to take the incident any further, because she wanted to focus on her own mental wellness. Id. Ann did, however, provide Rankin with Sonoiki's name "in case other girls reported so that the administration could track later cases if they became a pattern." Id.

Meanwhile, Sonoiki spent the summer of 2012 working as a summer analyst at Goldman Sachs in New York City. Doc. No. 162-1 ¶ 234; Doc. No. 145-15 at 11. Sonoiki's classmate and friend, Betty, was also working in New York City that summer. Doc. No. 145-15 at 11. The two agreed to share a studio apartment and the apartment's only bed. Id. Sonoiki and Betty were not involved in a sexual relationship when they became roommates. Id. At the outset of the summer, Sonoiki had a girlfriend, with whom Betty was friends. Id. During the first month of their cohabitation, however, Sonoiki and Betty had sex at least twice. Id. Later that summer, Sonoiki broke up with his girlfriend, and he engaged in consensual sex with Betty on "a couple" of occasions. Id.

Sonoiki received an offer to return to Goldman Sachs after his graduation. Doc. No. 162-1 ¶ 234. He returned to Harvard for a senior year filled with more public success. His peers selected him to serve as the Male Harvard Orator at Class Day—a special event for graduates and their families, held the day before Harvard commencement. Doc. No. 164-16 ¶ 6. He was admitted into Harvard Business School's 2+2 program, whereby he would work for two or more

years before attending Harvard Business School. Id. ¶ 3. He continued to earn A and B grades.[7]

Doc. No. 145-7 at 7. By May 16, 2013, Sonoiki had completed his undergraduate coursework

and finished his final examinations. Doc. No. 164-16 ¶ 5.

    C.    <u>May 2013 Events</u>

    On May 7, 2013, Sonoiki attended a formal with one of his female friends. Doc. No. 145-

9 at 11. Cindy, an acquaintance of Sonoiki, attended the party with one of her friends. Id. Sonoiki

and Cindy had shared a drunken—but consensual—kiss about a month earlier at a school

concert. Id. at 12. They had also exchanged a series of text messages fairly characterized as

flirtatious, though in the texts Cindy expressly rejected Sonoiki's propositions for sex. Id. at 12–

14. Turning back to the formal, at around 1:40 a.m. on May 8, Cindy's date left to go to the

bathroom. Id. at 11, 14. Sonoiki approached Cindy and tried to kiss her, but she turned away. Id.

She then suggested they go somewhere else for a bit before her date returned. Id. The pair left the

dining hall and, at Cindy's suggestion, proceeded downstairs to the basement towards the gym.

Id. Both Sonoiki and Cindy agree that they engaged in kissing in the basement and that

intercourse occurred. They disagree about certain details of this encounter, which are described

later in this section.

    On May 8, 2013, Cindy went to University Health Services for emergency contraception.

Id. at 15. She was examined by a doctor, who noted bruising on Cindy's left hip and upper thigh.

Id. Cindy met with Sarah Rankin on May 9 and described to her what transpired with Sonoiki at

the formal.[8] Id. On May 10, Cindy went to Cambridge Hospital, where she underwent a sexual

---

[7] Sonoiki was not enrolled in courses during the Fall 2012 semester, Doc. No. 145-7 at 7, though
no party has raised this issue or suggested why it might have any bearing on the instant case.
[8] In her statement to the Ad Board, Cindy said that she initially told Rankin that she was not
interested in reporting Sonoiki to the Ad Board. Doc. No. 145-9 at 15. Rankin told Cindy that

assault forensic exam. Id. at 16. Cambridge Hospital records report Cindy said she was "intoxicated" at the formal, and the records include a diagnosis of "Sexual Assault."[9] Id. at 56. Cindy also spoke with Jay Ellison, Associate Dean of Harvard College and Secretary of the Ad Board, at some point before May 17, 2013—though she had not yet decided whether to file a formal complaint against Sonoiki. Id. at 16.

On May 17, 2013, some ten days after the formal, Sonoiki received an email from his Resident Dean Laura Johnson instructing him to speak with Ellison. Doc. No. 162-1 ¶ 60. That day, Sonoiki met with Ellison and another administrator regarding possible violations of Harvard policies. Id. ¶ 62. Ellison informed Sonoiki that "a number" of his peers had raised concerns that Sonoiki had violated sexual misconduct rules. Id. ¶ 63. The same day, Ellison reiterated his message in a letter to Sonoiki:

> As we discussed in our meeting this morning, it has been brought to my attention that a number of your peers have raised concerns that you may have violated the rules established by the Faculty of Arts and Sciences regarding sexual misconduct. . . . I advised you that . . . you should be aware that this information is known to the College and has caused great concern, and we are continuing to evaluate how best to respond to the information we are receiving.

Doc. No. 145-3 at 91. After his meeting with Ellison, Sonoiki spoke with Johnson. He remembers Johnson telling him that the allegations against him were serious; he remembers her saying, "it's more serious than sort of a—you know, someone that you hug for too long." Doc. No. 145-102 at 67.[10]

_____

there had been other accusations against him. Id. At the same time, Cindy heard rumors of other complaints against Sonoiki from friends who knew about what happened to her with Sonoiki. Id.
[9] Cindy submitted medical records from Cambridge Health Alliance to the Ad Board. Doc. No. 145-66 at 6. However, these records are not before the Court, as they were redacted in the Disciplinary Case Report. Doc. No. 145-66 at 64–81.
[10] Harvard contends that Johnson spoke to Sonoiki and explained the situation was "more serious" than he had appreciated. Doc. No. 162-1 ¶ 68. In support, Harvard cited Sonoiki's deposition quoted in the text. Id. Sonoiki "disputed" this assertion because "Sonoiki knew that he had never been sexually inappropriate with anyone" and "thought the allegations may regard

Shortly thereafter, Sonoiki spoke with Cindy.[11] Id. at 72–73. According to Sonoiki, Cindy said she was being "pressured" to file allegations, that she was "unsure" what to do, that she did not think Sonoiki was a "bad guy," that "she didn't think anything of [their] encounter," but that she was being told Sonoiki was "a serial sort of predator" and "she was really struggling with what to do." Id. Sonoiki described feeling "worried" during his conversation with Cindy. Id. at 74. He was thinking about "worst case" outcomes, and so he was "really pleading and pleading" with Cindy to refrain from filing a complaint against him.[12] Id.

After his conversation with Cindy, Sonoiki emailed Ellison, stating that he was "shocked and upset" by their meeting and wanted to remove himself from campus to "fully ensure" he was not in a position for "any more misunderstanding or miscommunication." Doc. No. 162-1 ¶ 72. On May 28, 2013—two days before the Class of 2013 Commencement Day—Ann and Cindy filed complaints with the Ad Board accusing Sonoiki of sexual assault. Id. ¶ 73.

In her initial statement, Cindy provided the following description of her encounter with Sonoiki during the formal. She went with him willingly into the basement. Doc. No. 145-9 at 14. The two kissed beneath the basement stairwell. Id. Sonoiki pulled down Cindy's underwear and performed oral sex on her. Id. Cindy was shocked and said, "No. Stop it . . . Dam, stop it." Id. Cindy had to take his hand and pull it to get him to stop. Id. They started kissing again. Id.

---

misinterpreted social behavior." Id. Sonoiki's belief in his own innocence does not dispute (a) that Johnson told him the allegations against him were serious, or (b) that Sonoiki was on notice of Johnson's message.

[11] Ellison had instructed Sonoiki not to speak with possible complainants, though Ellison did not identify the possible complainants by name. Doc. No. 145-3 at 91.

[12] Sonoiki now disputes that he ever "pleaded" with Cindy, Doc. No. 162-1 ¶ 70, even though that is the word *he* said in his deposition that he used in his conversation with Cindy, Doc. No. 145-102 at 74. Sonoiki cannot merely disavow his under-oath testimony by invoking the word "disputed." See, e.g., Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d 380, 387 (1st Cir. 2016) (authorizing district courts to disregard an affidavit contradicting, without explanation or basis, previous under-oath testimony).

Sonoiki then turned Cindy's whole body around and bent her over. Id. at 15. He pulled down her underwear and began penetrating her. Id. He did not use a condom. Id. The interaction ended when Sonoiki ejaculated on the floor and pulled up his pants. Id. Cindy said she was "shocked." Id.

Sonoiki's initial statement to the Ad Board mirrors Cindy's chronology but differs as to the details of the encounter. According to Sonoiki, both he and Cindy pulled her underwear down before he performed oral sex, Cindy inserted his penis into her vagina, the intercourse lasted for "some time," and Cindy "moan[ed] in approval, or at least in a way that was easy to interpret as approval." Id. at 20–21. At some point thereafter during intercourse, Sonoiki heard Cindy whisper, "stop." Id. at 21. Though it took him a few seconds to process the instruction, Sonoiki claims he complied. Id. The pair subsequently left the stairwell and returned to the party. Id.

Ann's complaint included the following allegations against Sonoiki. She approached Sonoiki at a Phoenix Club party on the night of September 9, 2011, with "no intention of engaging with him in any sort of sexual activity." Doc. No. 145-7 at 11. She explained that she had no memory of much of the evening—despite not drinking very much. Id.

> The next thing I remember is waking up to myself making noises indicating discomfort and pain. I was in a dark room, completely naked. I was lying on my stomach with all four limbs collapsed underneath me. A man was penetrating me from behind. I don't know why, but I knew it was Dam. Although I absolutely did not want to be engaged in this activity with this person, I was so shocked and afraid that I did not say anything. He finished the act a few moments after I awoke. When he pulled away, I turned around and confirmed the identity of my assailant. Dam then got up and left the room.

Id. Ann then grabbed a few of her belongings and left the room. Id.

In his response to Ann's complaint, Sonoiki described a different series of events. He claimed they spoke at a party and, at some point, Ann said, "Let's get out of here." Id. at 14.

ADD10

They took a taxi to the Quad, entered Sonoiki's dorm, and went to his room. Id. According to Sonoiki, Ann performed oral sex on him, she inserted his penis into her vagina, they had sex, and then Ann went to sleep. Id. He then got up and went to a suitemate's room until Ann left. Id. at 15. Sonoiki and Ann both agree she left some of her clothes in his room and that he returned these items to her the next day. Id.

In response to the filing of the two complaints on May 28, 2013, Ellison wrote to Sonoiki that same day: "I need to meet with you tomorrow to discuss a very important issue. I am afraid you know what this is about but I believe it would be helpful for us to talk once again." Doc. No. 145-8 at 2. Ellison asked Sonoiki if he had time to meet the following morning. Id. Ellison copied Johnson on the email so "that she c[ould] join [them] if possible." Id. Ellison followed up with another email the next day, stating that he needed to speak with Sonoiki "immediately." Doc. No. 145-12 at 2. Ellison wrote Sonoiki a letter on May 29, 2013, notifying him of the formal complaints against him. The letter stated: "you will not be eligible to receive your degree on Commencement Day, May 30, 2013." Doc. No. 145-3 at 86. The letter quoted a provision of the Handbook which states: "Students are expected to comply with all disciplinary rules from matriculation until the conferring of the degree. A degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending." Id. Johnson forwarded the letter to Sonoiki via email on May 29, 2013, at 10:03 p.m. Id. at 85. The letter was sent as an attachment with the filename "Withheld Degree Letter 5 29 13.pdf." Id.

On May 28, 2013, Ellison also wrote to the Registrar to remove Sonoiki's name from the list of students the Faculty Council would consider for graduation. Id. at 88. Ellison stated that the allegations against Sonoiki were "serious" and that he "expect[ed] more to come." Id. He predicted that the Ad Board would "need to conduct a full investigation and hearing into the

matter," and accordingly asked that Sonoiki's degree "not be voted and not . . . be awarded." <u>Id.</u> An official in the Office of the Governing Boards confirmed on May 29 that Sonoiki's name was "removed" from the list of students whose degrees would be voted on and awarded. Doc. No. 145-10 at 2.

Sonoiki maintains that he did not read any of Ellison's or Johnson's emails prior to commencement. Doc. No. 162-1 ¶ 83. Nonetheless, the record establishes Sonoiki did respond to some of these emails prior to commencement. Doc. No. 145-12 at 2. Specifically, on May 30, 2013, at 6:10 a.m., Sonoiki replied to Ellison's May 29 email that read: "I need to see you right away. Please come to my office immediately after the class day exercise is over." Doc. No. 145-12 at 2. In his response, Sonoiki stated that he had "fallen very behind on emails" due to his family visiting. <u>Id.</u> He requested a meeting that evening, with Johnson present "if possible." <u>Id.</u>

In response, Ellison suggested a meeting on Monday, June 3, 2013. <u>Id.</u> Sonoiki replied at 9:01 a.m. on May 30, writing: "Okay, phone call Monday. Thank you very much and apologies for being out of touch. I look forward to getting this resolved in a fair manner." <u>Id.</u> at 3. Twenty minutes later, Sonoiki emailed again, this time saying: "Could we speak tomorrow afternoon on the phone or Skype? Thank you."[13] <u>Id.</u>

Sonoiki gave his Class Day speech, as planned. Doc. No. 162-1 ¶ 11. He also participated in commencement ceremonies. While he was waiting in line at commencement, Johnson pulled him aside and told him: "[Y]our degree will not be in the envelope." <u>Id.</u> ¶ 83.

---

[13] The meeting eventually occurred on June 3, 2013, and it was the "initial meeting" regarding the Ann and Cindy complaints. Doc. No. 162-1 ¶ 107.

D.    Disciplinary Investigation: Initial Review Phase

The Ad Board's investigation into Sonoiki's conduct continued in the days after commencement. Ellison met with Sonoiki on June 3, 2013, regarding the Ann and Cindy complaints. Doc. No. 162-1 ¶ 101. The pair reviewed written documents explaining Harvard's disciplinary procedures. Id. ¶ 97. On June 3, Ellison emailed Sonoiki two letters dated May 29, 2013. Doc. No. 162-1 ¶ 108; Doc. No. 145-7 at 4–5; Doc. No. 145-9 at 4–5. In both, Ellison wrote that the letters themselves "serve[d] as written confirmation that the Office of the Dean of Harvard College received on May 28, 2013, a formal complaint against you from another undergraduate student in the College whose name will be given to you orally." Doc. No. 145-7 at 4; Doc. No. 145-9 at 4. The letters further explained that the College was "initiating the process to determine whether a violation of the Faculty's policy occurred" and cited to the Handbook. Doc. No. 145-7 at 4; Doc. No. 145-9 at 4.

The next day, June 4, 2013, Betty filed a complaint with the Ad Board, alleging that Sonoiki had sexually assaulted her during the first part of the time they lived together in the summer of 2012. Doc. No. 162-1 ¶ 109. The Ad Board's initial review process expanded to encompass all three cases, with an independent fact finder appointed to assist in the three investigations. Id. ¶ 120. Sonoiki picked Johnson to serve as his Board Representative to the Ad Board. Id. ¶ 126. Each complainant student submitted an initial statement explaining her experiences with Sonoiki. Doc. No. 145-7 at 11–13; Doc. No. 145-9 at 11–17; Doc. No. 145-15 at 11–12. Sonoiki promptly submitted an initial respondent statement in each case. Doc. No. 145-7 at 14–16; Doc. No. 145-9 at 18–22; Doc. No. 145-15 at 13–20. The Ad Board subcommittee conducted preliminary interviews with Sonoiki and the complaining students. Doc. No. 162-1 ¶¶ 147–49.

The Handbook and related documents authorized Sonoiki to select a "personal advisor" from among the officers of the University, such as a proctor, tutor, coach, teaching fellow, instructor, or faculty member. Doc. No. 146-7 at 4. At no point in the disciplinary process did Sonoiki select a personal advisor. Doc. No. 162-1 ¶ 130. On June 4, 2013, the day after Sonoiki's initial meeting with Ellison and the day Betty filed her complaint, Johnson wrote to Sonoiki stating:

> Since you haven't told your parents, I will tell you that if my child were involved in a case like this, I would encourage him to consult an attorney. While attorneys don't have a role in the college process, I would still want my child to talk with someone about any legal implications of the process.

Doc. No. 145-16 at 2. At no point in the disciplinary process did Sonoiki follow this advice.

On June 21, 2013, the subcommittee recommended that the Ad Board vote to issue a charge in each of the three cases against Sonoiki. Doc. No. 162-1 ¶ 155. Sonoiki wrote a statement in response to this recommendation. Id. On June 25, 2013, the Ad Board voted to issue a charge against Sonoiki for sexual misconduct in each of the three cases. Id. ¶ 156.

E.    Disciplinary Investigation: Post-Charge Investigation Phase

After Sonoiki was formally charged, the Ad Board subcommittee ramped up its investigative efforts. It interviewed thirteen witnesses and collected a total of nineteen witness statements. Id. ¶¶ 161–64. It also interviewed Sonoiki multiple times. Id. ¶¶ 168–71. The subcommittee's investigation stretched from July 2013 until November 2013. Id. ¶ 193. At the conclusion of its investigation, the subcommittee compiled three confidential reports.[14] The reports contained the subcommittee's findings regarding the factual circumstances of each case, as well as assessments of witness credibility and disciplinary recommendations. In each of Sonoiki's cases, the subcommittee recommended that the Ad Board require Sonoiki to withdraw

---

[14] These reports are sometimes referred to as "Disciplinary Case Reports." Doc. No. 162-1 ¶ 50.

from Harvard College for four terms. Doc. No. 145-7 at 48; Doc. No. 145-9 at 63; Doc. No. 145-15 at 59. As to Cindy's case, the subcommittee concluded that Sonoiki had "engaged in sexual intercourse with Cindy against her will." Doc. No. 145-9 at 63. In its detailed explanation for this conclusion, the subcommittee noted, among other points, that "the purplish bruising on Cindy's left hip and right upper thigh recorded in the report of Cambridge City Hospital" supported the conclusion that Sonoiki had used force. Id. The subcommittee similarly concluded that Sonoiki had committed sexual misconduct in the cases of Ann and Betty. The subcommittee also urged the Ad Board, in each case, to recommend that the Faculty Council dismiss Sonoiki from Harvard College. Id. Sonoiki submitted written responses to the subcommittee's recommendations. Doc. No. 162-1 ¶ 201.

On November 19, 2013, the Ad Board accepted the recommendations of the subcommittee. In particular, it voted in each of the three cases to require Sonoiki to withdraw from Harvard College for four terms. Doc. No. 145-7 at 90. It also recommended to the Faculty Council that Sonoiki be dismissed from Harvard College. Id. Sonoiki indicated that he planned to appeal the Ad Board's decision. Doc. No. 162-1 ¶ 214. Per Harvard's disciplinary policies, Sonoiki had a six-month period to initiate his appeal. Id. ¶ 215.

F.      Sonoiki's Post-Harvard Activities and Appeal

Throughout most of the disciplinary process described thus far, Sonoiki worked as an investment analyst at Goldman Sachs. Doc. No. 162-1 ¶ 234. On May 5, 2014, with weeks left to appeal the Ad Board's decisions and recommendations and his appeal not yet filed, Sonoiki received an offer to join a hedge fund called Taconic Capital Advisors. Doc. No. 145-67 at 2. The new job offered higher pay than his position at Goldman Sachs. Compare Doc. No. 145-67 at 2, with Doc. No. 162-1 ¶ 236. Sonoiki accepted the offer. Taconic, however, rescinded the

offer on May 16, 2014, after an investigative report revealed that Sonoiki lacked a college degree. Doc. No. 145-70 at 2; Doc. No. 162-1 ¶ 243.

Sonoiki continued to work at Goldman Sachs after Taconic rescinded its job offer. Id. ¶ 247. On May 19, 2014, Sonoiki filed his objection to the Ad Board's recommendation of dismissal. Doc. No. 145-73 at 2–8. He filed the appeal himself, without the assistance of a lawyer. Sonoiki disputed that he had committed any rape or sexual assault. Id. at 2. He argued that he was "blind-sided by the subcommittee's recommendation of dismissal" because "Cindy told [him] the worst thing that could happen to [him] is that [he] would have to withdraw for one or two years." Id. at 4. He went on to explain that, had he understood his diploma hung in the balance, he would have retained counsel and selected a personal advisor. Id.

He also claimed that Harvard's disciplinary process was "fundamentally unfair" because the sanctions arose in one consolidated proceeding, denying him the opportunity to "learn [his] lesson" after an initial punishment. Id. He identified various evidentiary reasons from the record that, in his view, supported his position, and he highlighted the many positive contributions he had made to the Harvard community. Id. at 5–7. The appropriate sanction, he argued, would be to allow him to withdraw from Harvard and "eventually" receive his diploma. Id. at 6.

In July 2014, Sonoiki was working in the technology group at Goldman Sachs. Doc. No. 146-10 at 4. He told Mychal Kendricks, who was then an NFL player for the Philadelphia Eagles, that one of Goldman's clients was the target of a takeover. Id. Kendricks traded on this inside information, with Sonoiki executing the trades. Id. at 5. Sonoiki and Kendricks worked together to orchestrate trades on three more occasions between September and November 2014 based on material, non-public information Sonoiki received by virtue of his position at Goldman Sachs. Id. at 6–8. Sonoiki received cash and tickets to NFL games for his role in the scheme.

Doc. No. 146-9 at 3. Though these events occurred in 2014, they did not come to light for almost four years. Id.

On October 16, 2014, the Docket Committee of the Faculty Council overruled Sonoiki's objections to the suspension imposed by the Ad Board and affirmed the Ad Board's decision. Doc. No. 162-1 ¶ 219; Doc. No. 28-4 at 2. On December 10, 2014, again over Sonoiki's objections, the Faculty Council dismissed Sonoiki from Harvard, thereby adopting the Ad Board's recommendation. Doc. No. 145-83 at 2. The Faculty Council took all of these actions in each of Sonoiki's three cases. Id.

A few months later, in May 2015, Sonoiki resigned from Goldman Sachs after an anonymous caller informed his employer that he lacked a Harvard degree. Doc. No. 162-1 ¶ 247.

Sonoiki switched gears and started working in the entertainment industry. By May 2015, he had an offer to work as a staff writer on ABC's Black-ish. Id. ¶ 250. He sold television pilots to Warner/TBS and HBO. Id. ¶ 256. After he was not invited back for another season of Black-ish, id. ¶ 253, he became a story editor for The Simpsons, id. ¶ 258.

In 2017, Sonoiki petitioned the Faculty Council to readmit him to Harvard College. Id. ¶ 222. He also corresponded with Betty and Cindy and urged them to consider supporting his application. Doc. No. 145-87 at 2–22. Neither Betty nor Cindy did so. The Faculty Council sent Sonoiki's petition to the Ad Board for a recommendation. Doc. No. 145-88 at 2. The Ad Board did not recommend Sonoiki's readmission to the College. Doc. No. 145-89 at 2. On March 22, 2018, the Secretary of the Faculty informed Sonoiki that the Faculty Council had denied his request for readmission. Doc. No. 145-91 at 2.

In September 2018, while still working on The Simpsons, Sonoiki pled guilty to securities fraud and conspiracy charges in a Pennsylvania federal court based on his role in the

2014 insider-trading scheme described above.[15] Doc. No. 162-1 ¶ 268. Some three months later, Sonoiki lost his job on The Simpsons. Id. ¶ 262. He moved back to his hometown of Houston, Texas, and began working as a writer for online publications. Doc. No. 125-7 at 3–4.

Sonoiki filed suit against Harvard in October 2019. Doc. No. 1. The Court discusses additional facts, when relevant, in Section IV, infra.

III.    LEGAL STANDARD

A.    Summary Judgment Framework

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Facts are material when they have the "potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). Disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018) (quoting Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992)).

The nonmoving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Bos., 452 F.3d 94, 98 (1st Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986)). On issues where the non-moving party bears the ultimate burden of proof, the non-moving party must present "'definite, competent evidence'" to rebut the motion. Mirabella v. Town of Lexington, Mass., 64 F.4th 55, 57 (1st Cir. 2023) (quoting Mesnick v. Gen. Elec. Co.,

---

[15] On July 29, 2021, the federal court sentenced Sonoiki to one month in prison followed by three years of supervised release. Doc. No. 146-13 at 3.

950 F.2d 816, 822 (1st Cir. 1991)). The "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

       B.     Breach of Contract Law

Sonoiki has one remaining claim; it is for breach of contract. A successful breach of contract claim under Massachusetts law has four elements. The plaintiff must demonstrate: first, "that there was an agreement between the parties . . . supported by consideration"; second, that "the plaintiff was ready, willing, and able to perform his or her part of the contract"; third, that "the defendant committed a breach of the contract"; and fourth, that "the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016).

In the context of colleges, "[a] student's relationship to his university is based in contract." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)). The Handbook and its incorporated documents supply the terms of the contract.[16] Sonoiki, 37 F.4th at 704. Massachusetts law governs the

_____

[16] The parties cite to the 2012–2013 Handbook and related documents, listed below, constituting the contract.
- General Regulations regarding Sexual Assault and Other Sexual Misconduct. Doc. No. 146-3 at 4.
- The Faculty of Arts and Science's Policy Statement on Rape, Sexual Assault, and Other Sexual Misconduct. Doc. No. 146-3 at 5–8.
- General Regulations regarding the Ad Board. Doc. No. 146-4 at 4–14.
- The Ad Board's "Information for students facing allegations in a peer dispute case" ("Student Information Form"). Doc. No. 146-7 at 2–9.
- The Ad Board's "General Information on Disciplinary Cases" ("General Information Form"). Doc. No. 146-6 at 2–3.
- The Ad Board's "Disciplinary Process" flowchart "for allegations involving a peer dispute." Doc. No. 146-1 at 2.
- The Ad Board's "Reconsideration and appeals" statement. Doc. No. 146-8 at 2.
- The Faculty of Arts and Science's "Rules of Faculty Procedure." Doc. No. 146-5 at 2–7.

contract, as both parties concede. See Doe v. Stonehill Coll., 55 F.4th 302, 316 (1st Cir. 2022);

Doc. No. 163-1 at 14; Doc. No. 144-1 at 19.

Massachusetts law recognizes breach of student-university contracts based on the

"reasonable expectations" of a reasonable student. Stonehill, 55 F.4th at 316–17. In assessing a

"reasonable expectations" breach of contract claim, courts consider the university's

"'manifestation'" toward its students and "'what meaning the . . . university, should reasonably

expect the student to give it.'" Id. at 316 (quoting Schaer v. Brandeis Univ., 735 N.E.2d 373, 378

(Mass. 2000)). "A student's expectation can be reasonable even if the precise expectation is not

stated explicitly in the contract's language." Sonoiki, 37 F.4th at 709. The appropriate inquiry is

whether "the student's expectation, viewed objectively alongside the express terms of the

contract, is based on the student's fair interpretation of the contract's provisions." Id.; accord

Stonehill, 55 F.4th at 316.

IV.   DISCUSSION

Sonoiki advances two categories of theories in support of his breach of contract claim. In

the first category, he advances four theories of breach arising from Harvard's handling of his

disciplinary cases. In the second category, he advances one theory arising from Harvard's failure

to confer his college degree. The Court first addresses the disciplinary process theories.

A.   The Disciplinary Process Theories

Sonoiki advances four breach of contract theories related to Harvard's disciplinary

procedures: (1) that Johnson failed to advocate for him during the disciplinary process; (2) that

Johnson breached her duty of confidentiality; (3) that Johnson failed to communicate the names

of adverse witnesses; and (4) that Harvard failed to conduct one required initial disciplinary

meeting and conducted another such meeting improperly. To defeat Harvard's motion on each

ADD20

theory, Sonoiki must demonstrate a contractual right, breach, and harm.[17] Specifically, as to

harm, he must present evidence showing that the breach committed by Harvard would have

"changed the outcome" of his disciplinary cases. Doe v. Williams Coll., No. 20-30024, 2022 WL

4099273, at *16 (D. Mass. Sept. 7, 2022); accord Doe v. Brown Univ., 210 F. Supp. 3d 310, 335

(D.R.I. 2016) (holding plaintiff-student must demonstrate that breach "actually affected"

outcome of disciplinary case); cf. Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 726 (1st Cir. 1983)

("Failure of the university to produce the witnesses requested by [plaintiff], whose relevance and

importance are far from obvious, did not violate the [applicable] fairness standard . . . .").

Sonoiki must present "definite, competent evidence" to support each element of each

theory. Mirabella, 64 F.4th at 57. The Court addresses these theories first individually, and then

collectively.

### 1. Advocate Theory

Sonoiki claims that Johnson failed to advocate on his behalf despite an alleged duty to do

so under Harvard's published procedures. To establish this duty, Sonoiki points to language from

the Student Information Form, which describes the Representative Role as follows:

> Your Board Representative is an officer of the College and you should be open and
> honest when talking with him or her. The role of your Board Representative,
> whether your resident dean or Board alternate, is to represent you to the
> subcommittee and the Board. He or she will be present at all meetings and will
> make certain that you are kept informed throughout the process. Your Board
> Representative also will present to the Board a full summary of the facts of the case
> in which you are involved; he or she will not advocate for you but will make certain
> that your perspective is clearly presented. Though your Board Representative does
> not vote on your case, he or she does speak on your behalf and participates in
> deliberations about your case.

Doc. No. 146-7 at 4.

---

[17] The parties do not dispute that they formed a valid, binding contract. See Doc. No. 162-1
¶ 104.

Sonoiki primarily relies on these statements to support his assertion that Johnson had a duty to "advocate" for him, citing, among other provisions, the language requiring his Board Representative to "represent" him, keep him "informed," and "make certain that [his] perspective is clearly presented." Id. Of course, the Form also states the Board Representative "will not advocate for" the respondent student and will address the subcommittee if there are relevant facts that the Board Representative and respondent student had discussed, but that the respondent student failed to raise himself. Id. at 4–5. The General Information Form states that the Board Representative's role is to "mak[e] certain the student's 'voice' is heard" and encourages respondent students to "work closely with their Board Representative[s]" to "ensure that the Board receive[d] a full and balanced account of a case or petition." Doc. No. 146-6 at 2.

At the dismissal stage, the Court of Appeals found the contract documents ambiguous regarding Harvard's contention that Board Representatives were not "advocates":

> While the Ad Board Procedures disavowed any advocacy role of the Board Rep in one phrase (which Sonoiki acknowledges in his complaint), the various descriptions of the Board Rep's role in relation to the student—such as represent, speak on behalf of, clearly present the student's perspective—seemingly contradict this one disclamatory phrase and do sensibly suggest some level of advocacy from the Board Rep would be reasonably expected by the student.

Sonoiki, 37 F.4th at 710–11.

Several further considerations are material. Harvard's disciplinary process does not permit respondent students to attend interviews of witnesses or complaining students. Rather, respondent students receive written summaries of the statements and reports from their Board Representatives. Doc. No. 146-7 at 5. Similarly, respondent students cannot attend most Ad Board meetings, but instead depend upon their Board Representatives to keep them abreast of case developments. Id. at 6. The Circuit decision along with the text of the contract and the

foregoing provisions together extinguish any notion that the contract imposes no advocacy role whatsoever upon the Board Representative.

Drawing all reasonable inferences in favor of Sonoiki, and considering the text of the contract, a reasonable student could conclude that his Board Representative would act as an advocate in some form. This is particularly so given that Harvard's disciplinary process excludes respondent students—but not Board Representatives—from most Ad Board meetings pertaining to their case.[18] That Board Representatives do not vote in disciplinary cases, id. at 4, also supports this understanding of the role.

Yet, no reasonable student would think the Board Representative is an advocate in the sense of the commonly understood role of a criminal defense attorney. For starters, the language of the contract includes a disavowal of the role of "advocate." Id. at 4. It also precludes participation by lawyers, requires students to speak for themselves, designates a student's Resident Dean as his default Board Representative, and limits a student's choice of alternate Board Representatives to voting members of the Ad Board. Id. A respondent student must communicate directly to the Ad Board, rather than speak through his Board Representative. Id. While the Board Representative can review a student's statement for organization, length, and clarity, Harvard emphasizes that a respondent student must write his own statements— establishing that the student bears the responsibility to explain himself. Id.

In any event, the Court need not define the precise contours of the Board Representative's advocacy responsibilities, because Sonoiki must submit evidence that Johnson

---

[18] Respondent students are, however, interviewed by the Ad Board subcommittee on multiple occasions. Doc. No. 146-7 at 5–6.

breached her duty.[19] This he fails to do. With the full benefit of discovery, Sonoiki has failed to offer evidence that Johnson: did not do or say something she should have; said or did something she should not have; did not present his point of view to the Ad Board; or failed to review his written statements to the Ad Board in advance of filing. In short, Sonoiki points to no evidence that Johnson breached her duty to advocate on his behalf, however it is defined.[20] That alone forecloses Sonoiki's advocate theory.[21]

There are three more issues here. First, Sonoiki claims he cannot know how Johnson breached her duty, as he was not present in the Ad Board meetings. Not so. Discovery presented an opportunity to learn more about the Ad Board proceedings. Sonoiki had the opportunity to obtain documents, interrogatory answers, and depositions regarding the entire scope of the process. Moreover, Sonoiki bears the burden of proof on each element of his contract claim.

---

[19] Sonoiki fails to define his interpretation of the "advocate" role, or explain how Johnson should have done more, given the constraints imposed by Harvard's procedures. The Ad Board process does not provide for the cross-examination of witnesses, requires respondent students to author their own statements, and does not allow for professional lawyers to participate in the process. Doc. No. 146-7 at 4–5.

[20] Sonoiki testified that Johnson "didn't want to be there in the first place [which] is reflected in just her performance in general." Doc. No. 164-12 at 30. When asked to "point to anything specifically," Sonoiki stated that Johnson "could have helped me formulate things better or help do things better." Id. at 30–31. This generalized accusation is not evidence of breach—or, for that matter, of harm—especially in a proceeding in which Sonoiki bore the obligation to develop a response. Sonoiki fails to offer further elaboration on this point in his Memorandum in Opposition to Summary Judgment. Doc. No. 163. The Court does note that, at his deposition, Sonoiki stated that Johnson "could have probably given me the identities of the witnesses" Id. The Court addresses that point in Section IV(A)(3), infra.

[21] Sonoiki states that he asked Johnson to share her notes from the Ad Board meetings and she failed to share them. Doc. No. 162-1 ¶ 38. Even if this factual assertion could constitute a breach of Johnson's advocate duties, Sonoiki has failed to demonstrate that sharing the notes: (1) would have revealed something he did not already know; (2) would have resulted in him doing something differently in the course of the disciplinary processes; or (3) otherwise affected the outcome of the disciplinary process.

Second, the summary judgment record shows that on May 31, 2013, Johnson sent the

following email to Ellison:

> I would love to talk sometime today about whether it would be better for [Sonoiki]
> to work with another Board representative. I just found out that Betty will be one
> of the complainants, and I feel very close to her. In addition, she will be in [my]
> House next year, and [Sonoiki] will not. I want the process to be as smooth as
> possible for both students, and it's always hard to balance conflicting needs, but I
> think on balance it might be harder for Betty to have me working with [Sonoiki]
> than it would be for [Sonoiki] to work with someone else.

Doc. No. 145-14 at 3.

Ellison replied, stating that Betty was probably going to choose another Ad Board

member as her Representative, and that Johnson was expected to work with Sonoiki. Id. at 3.

Ellison also stated, "[Sonoiki] knows you and so far seems to want to work with you. As you

know students are told that the Board representative is not an advocate or an adversary but

simply a representative." Id. at 2. Neither Johnson nor Ellison revealed this email exchange to

Sonoiki. Doc. No. 162-1 ¶ 121. For present purposes, the Court assumes that Sonoiki, despite his

friendship with Betty, was unaware of Betty's bond with Johnson, or that Johnson had served as

Betty's Board Representative in a prior, unrelated disciplinary case. Doc. No. 164-10 at 28.

Nonetheless, these facts are of no assistance to Sonoiki's advocate theory. He has pointed to no

evidence showing that Johnson breached her duties as his Board Representative. Insofar as

Sonoiki advances that this was a sort of "conflict" giving rise to a form of structural error, the

Court rejects that notion. Whatever the contours of the advocacy duty may be, they do not go so

far as to establish breach based on a possible conflict of interest in the absence of evidence of

harm.[22] Cf. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980) (requiring criminal defendant to

---

[22] Whether Ellison and Johnson proceeded wisely by not informing Sonoiki of Johnson's May
31, 2013, email or the concern it expressed is not a matter for adjudication by the Court.

"establish that an actual conflict of interest adversely affected his lawyer's performance" and holding "that the possibility of a conflict is insufficient to impugn a criminal conviction").

Third, Sonoiki claims that Johnson shared adverse facts about him with the Ad Board. Though Johnson candidly admitted she believed her "purview" entitled her to do so, she testified as follows:

> Q: Did you ever share facts that you felt were undermining Damilare's position?
>
> A: *I don't recall doing so*, although it would have been in the purview of the Board representative to do so.

Doc. No. 164-10 at 8 (emphasis added).

In follow up, counsel asked Johnson if she "refrain[ed] from sharing facts" that would undermine Sonoiki's position, to which she responded, "No." Id. at 8–9. To "refrain" is merely "to keep oneself from doing, feeling, or indulging in something and especially from following a passing impulse." Refrain, Merriam-Webster's Collegiate Dictionary (11th ed. 2019). Johnson's statement is not evidence that she shared undermining facts about Sonoiki. It is only evidence that she did not stop herself from sharing such facts. This is especially so when read in conjunction with her prior answer, which immediately preceded this one. The entire exchange shows only that: (1) Johnson thought she had the power to share undermining facts; (2) she did not hold herself back from sharing such facts; and (3) Johnson did not recall revealing any undermining facts about Sonoiki. Now, with the benefit of full discovery, Sonoiki cannot point to a single undermining fact that Johnson disclosed to the Ad Board. In short, even if the contract precluded Johnson from sharing undermining facts, there is no evidence that she did so.

Finally, even if Sonoiki could establish that Johnson breached her duty—which he has not done—he would also be required to establish the breach affected the outcome of one or more of his disciplinary cases. Williams Coll., 2022 WL 4099273 at *16; Brown Univ., 210 F. Supp.

3d at 335. This he has not done. He has identified no evidence whatsoever that would permit a jury to conclude that Johnson's "performance" as his Board Representative affected the outcome of his disciplinary proceedings.

For the foregoing reasons, Harvard's Motion for Summary Judgment is ALLOWED as to the advocate theory.

### 2. Confidentiality Theory

Sonoiki next claims that Johnson had, and breached, a duty to keep their conversations confidential. The contract does not explicitly state that the Board Representative has a duty to maintain confidentiality, though it does explicitly define confidential relationships in other contexts. Compare Doc. No. 146-7 at 4 (describing Board Representative's role), with id. at 2 (describing confidential resources for students). The Student Information Form, however, encourages students to be "open and honest" with their Board Representatives. Id. at 4. The General Information Form also encourages students to "work closely with their Board Representative[s]" and share draft statements with their Board Representatives for feedback. Doc. No. 146-6 at 2. Drawing all inferences in Sonoiki's favor, a reasonable student could expect his Board Representative to keep their discussions, or at least some portion of them, confidential.[23]

The existence of the duty of confidentiality is of no assistance to Sonoiki, however, for he fails to show that Johnson breached her duty. This is so even though Johnson did not view their discussions as confidential, Doc. No. 164-10 at 14, because Sonoiki cannot identify any

---

[23] Harvard points out that the contract also states that the Board Representative will "present to the [Ad] Board a full summary of the facts of the case." Doc. No. 146-7 at 4. Viewed through the summary judgment lens, no reasonable student would understand this statement to mean that the Board Representative would inform the Ad Board of materially adverse facts disclosed privately.

confidential information that she did disclose—even after full discovery. See, e.g., Doc. No. 145-27; Doc. No. 145-28. Indeed, the following exchange occurred during Sonoiki's deposition:

> Q: Is there anything that you shared with Ms. Johnson that you expected would be kept confidential and wasn't?
>
> A: I don't know.

Doc. No. 164-12 at 39.[24]

Sonoiki does make one more argument on this point. He thought Johnson "might" have disclosed information from an email dated July 6, 2013. Doc. No. 162-1 ¶¶ 190–91. In the email, Sonoiki shared one of his journal entries, in which he expressed frustration with Harvard's disciplinary process. Doc. No. 145-3 at 64. But the undisputed evidence establishes that Sonoiki copied Ellison on the same email. Id. Ellison, of course, owed Sonoiki no duty of confidentiality. Sonoiki, therefore, had no reasonable expectation of privacy as to the Ad Board in this email, and it cannot serve as evidence to support his confidentiality theory. Thus, Sonoiki has failed to present any evidence showing that Johnson breached her duty of confidentiality.

Even if Sonoiki could provide evidence establishing such a breach, he has not offered any evidence to show that the breach affected the outcome of the disciplinary proceedings against him—which is necessary to prove harm. Williams Coll., 2022 WL 4099273, at *16; Brown Univ., 210 F. Supp. 3d at 335.

Accordingly, Harvard's Motion for Summary Judgment is ALLOWED as to the confidentiality theory.

---

[24] Sonoiki's affidavit is silent on this point, Doc. No. 164-16, as are his other submissions in opposition to summary judgment.

3.  Witness Name Theory

Sonoiki argues that Harvard breached the contract because Johnson failed to give him the names of all witnesses who provided evidence to the Ad Board.[25] It is undisputed that Sonoiki learned some of the names, Doc. No. 162-1 ¶ 207, but Sonoiki denies knowing all of them, Doc. No. 164-16 ¶ 19, which, of course, the Court accepts as true for present purposes.

While the contract does not expressly provide for the disclosure of witness names, it does state that the respondent student's Board Representative will attend all pre-charge witness interviews, "so that they can inform [the respondent student] about what was said during the interview and *any information* that was obtained." Doc. No. 146-7 at 5 (emphasis added). After a charge has been issued, the Board Representative is still expected to attend all witness interviews and provide the respondent student with "copies of all documents *and other information* obtained by the fact finder and subcommittee." Id. at 6 (emphasis added). A reasonable student could—and likely would—expect that "any information" or "other information" obtained from interviews would include the witnesses' identities.[26] Additionally, the disciplinary procedures permit respondent students to issue final statements to the Ad Board after all interviews have been conducted. Id. at 6–7. A reasonable student would expect that this process was designed to give him an opportunity to rebut statements from adverse witnesses. Knowledge of witnesses'

---

[25] Sonoiki's argument has changed since he filed his Amended Complaint. He originally argued that "the Subcommittee never identified by name any of the adverse student witnesses against him." Doc. No. 63 ¶ 313. Now, he claims that Johnson failed to share the names with him. Doc. No. 163-1 at 32. Harvard has not shown that it was prejudiced or harmed by Sonoiki's decision to change his theory. For example, it has not identified any discovery or investigation it would have undertaken, had it known of this shift in theory earlier. Moreover, district courts are to "freely give" parties leave to amend their complaints in the absence of prejudice to another party. Fed. R. Civ. P. 15(b)(1). Thus, the Court considers the theory as articulated by Sonoiki in his opposition to the summary judgment motion.
[26] This is especially true when viewed through a plaintiff-friendly, summary judgment lens.

identities could be of critical importance when responding to their statements. It would provide the respondent student with a basis to investigate, to raise bias concerns, to challenge a witness's opportunity to observe, or even to challenge a witness's capacity to testify. Sonoiki has established, at least, that a reasonable student could expect to know the witnesses' names and that his Board Representative would provide the information. Of course, Sonoiki had no other way of learning the names, because the process excluded him from attending witness interviews.

Harvard contends that Sonoiki needed to proactively ask Johnson for the names—and that he not only failed to ask, but affirmatively told her that he did not wish to hear about witness statements. Doc. No. 145-53 at 2. While Harvard argues that Sonoiki willfully avoided hearing the witness statements, this evidence is not clear enough to render Harvard entitled to summary judgment.

Thus, for purposes of Harvard's motion, the Court concludes that Johnson bore an affirmative duty to share all witness names with Sonoiki, and that she did not discharge this duty as to every witness. Nonetheless, this theory still fails because Sonoiki offers no evidence that he suffered harm as a result of Johnson's breach. During the course of discovery, Sonoiki obtained the names of all the witnesses. Doc. No. 145 ¶ 39. Yet, he offers no evidence suggesting that, had he been armed with this information during the disciplinary process, he would have undertaken different or more investigative efforts, communicated additional or different information to the Ad Board, refrained from sharing certain information with the Ad Board, or done anything else differently. In sum, he has not identified evidence showing that the alleged breach actually affected the outcome of the disciplinary proceedings. Williams Coll., 2022 WL 4099273, at *16; Brown Univ., 210 F. Supp. 3d at 335.

Accordingly, Harvard's Motion for Summary Judgment is ALLOWED as to this theory.

4. <u>Meeting Theory</u>

Finally, Sonoiki argues that Harvard conducted its initial disciplinary meetings incorrectly by failing to notify him of his right to have Johnson present for his initial meeting with Ellison, or, in the case of the Betty complaint, by failing to conduct an initial meeting at all. This theory of breach fails as well.

The Handbook states: "Disciplinary cases . . . begin with a conversation between the student, his or her Resident Dean, and the Secretary of the Administrative Board or his or her designee, during which they discuss the incident, the relevant College rules or standards of conduct, and possible courses of action." Doc. No. 146-4 at 6–7. A reasonable student could conclude that he was entitled to this meeting, so that he could have the relevant College rules explained to him and learn the possible courses of action the University might pursue against him. While the contract does not explicitly state that the student's Board Representative must be present at the initial meeting, it does state that a student's Resident Dean will be present. A reasonable student could conclude that he was entitled to have his Resident Dean present at the meeting considering the contract language.[27] Additionally, the default procedure is for a respondent student's Resident Dean to serve as his Board Representative. Doc. No. 146-7 at 4. Sonoiki chose his Resident Dean, Johnson, to serve as his Board Representative. Doc. No. 162-1 ¶¶ 27, 126.

The undisputed facts establish that Ellison conducted an initial meeting on June 3, 2013, during which he and Sonoiki discussed the Ann and Cindy complaints. <u>Id.</u> ¶¶ 96–101. The meeting was conducted via telephone. <u>Id.</u> ¶ 99. Sonoiki denies Johnson was present for the

---

[27] Many Harvard students have personal relationships with their Resident Deans, and the Dean's presence might serve as a source of emotional support. <u>See</u> Doc. No. 162-1 ¶ 186.

meeting, id.; thus, for summary judgment purposes, Sonoiki has established that Harvard

breached its duty to have her present at the June 3 meeting.[28]

As for the initial meeting regarding Betty's complaint, Sonoiki claims that it never

happened, Doc. No. 163-1 at 27, while Harvard insists that it occurred around June 5, 2013, Doc.

No. 144-1 at 29–30. Applying the summary judgment standard, the Court will presume that the

meeting never occurred.

Nonetheless, this theory does not proceed past summary judgment, because Sonoiki has

not provided any evidence suggesting that he suffered harm because of Harvard's breaches. He

cannot and does not show that Johnson's presence at the June 3 meeting mattered. When asked

about the June 3 meeting at his deposition, and what effect Johnson's absence had on that

meeting, Sonoiki said, "Well I can't really speculate. I don't know." Doc. No. 145-102 at 109;

Doc. No. 162-1 ¶ 106. After fact discovery, Sonoiki has not shown any deficiency in the meeting

as to Ann's and Cindy's cases or that it affected the outcome of those two cases. In other words,

he has failed to demonstrate harm. As for Betty's case, Sonoiki has not shown how Harvard's

failure to hold another initial meeting affected his understanding of the disciplinary procedures

---

[28] Whether Johnson attended the meeting presents an issue of fact that can only be resolved at a trial. Harvard submitted a document signed by Ellison after the meeting, which states that he was "accompanied" by Johnson. Doc. No. 145-18 at 2. At the motion hearing, Sonoiki's counsel stated that Sonoiki "signed" the document as well. Ordinarily the Court would accept such a concession; however, the undisputed facts establish this meeting was conducted over the phone. Doc. No. 162-1 ¶ 99. While this fact alone would not have made a contemporaneous signature impossible in 2013, it does seem implausible under the circumstances. The Court declines to treat this document as establishing Johnson's presence for purposes of summary judgment. In addition, as to Sonoiki's affidavit denying Johnson's presence, Harvard urges the Court to reject this assertion in reliance on SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp., 188 F.3d 11 (1st Cir. 1999). That case held that a court need not credit "conclusory conjecture" or "self-serving speculation." SMS Systems, 188 F.3d at 24–25. That ruling does not stand for the proposition that the Court may disregard the under-oath statement of a percipient witness testifying as to who did or did not participate in a meeting the witness attended merely because the testimony comports with the self-interest of the witness.

or the allegation against him. Doc. No. 162-1 ¶ 31 (outlining topics covered at initial disciplinary meetings). Nor has he argued that he suffered any harm due to the absence of the initial meeting.

Accordingly, Harvard's Motion for Summary Judgment is ALLOWED as to the meeting theory.

### 5.   The Disciplinary Process Theories Considered Collectively

To be clear, the Court does not find that Harvard conducted Sonoiki's disciplinary cases flawlessly. As to two of his four theories, however, Sonoiki has failed to demonstrate breach. And, as to all four theories, he has failed to provide evidence supporting a finding that he was harmed by any procedural errors committed by Harvard, or that the errors affected the cases' outcomes. This was his burden on summary judgment. Williams Coll., 2022 WL 4099273 at *16; Brown Univ., 210 F. Supp. 3d at 335. The outcome of the analysis is the same when the four theories are considered collectively. That is, even when his theories are considered collectively, Sonoiki has failed to establish harm and thereby failed to sustain his breach of contract claim.

The Court therefore ALLOWS Harvard's motion and enters summary judgment in its favor on all four disciplinary process theories.

### B.   The Charge Theory

The Court now turns to Sonoiki's one remaining theory of liability. To succeed on his charge theory, Sonoiki must present admissible evidence showing that he performed his contractual obligations, thereby entitling him to a Harvard degree on Commencement Day, May 30, 2013. The question here is not whether Sonoiki personally felt that he would receive his degree on Commencement Day, but whether, on the summary judgment record, Sonoiki had a contractual entitlement to the degree. The Court's focus, then, turns to whether Sonoiki's

"expectation, viewed objectively alongside the express terms of the contract, is based on . . . [his] fair interpretation of the contract's provisions." <u>Sonoiki</u>, 37 F.4th at 709. Even viewing the record through a plaintiff-friendly, summary judgment lens, Sonoiki fails to meet his burden.

In the context of the Harvard-student contract, a student undertakes at least the following performance obligations, which are each conditions precedent to Harvard's obligation to confer a degree. First, the student must pay all the required fees and charges. Doc. No. 164-16 ¶ 10. The evidence establishes Sonoiki fulfilled this requirement. <u>Id.</u> Second, the student must complete all academic requirements for conferral of a degree, including by enrolling in the requisite number of courses and earning satisfactory grades. <u>Id.</u> ¶ 5. The evidence establishes that Sonoiki fulfilled this requirement as well. Doc. No. 162-1 ¶ 88. Finally, the student must remain in compliance with the governing conduct rules, as measured by Harvard, pursuant to Harvard's policies, which themselves are part of the contract. <u>See, e.g.</u>, Doc. No. 146-2. This is where Sonoiki's theory founders. He has not supplied evidence that would permit a jury to conclude that he satisfied this last performance obligation, which was a necessary precondition to obtaining a Harvard degree.

The contract documents establish that Harvard's conduct rules govern students from "matriculation until the conferring of [their] degree[s]." Doc. No. 146-4 at 8. This is undisputed. Doc. No. 162-1 ¶ 22. All reasonable students reading the contract would understand that they are required to comply with Harvard's conduct rules right up to the moment they receive a diploma at graduation. Next, the undisputed evidence establishes that Harvard published a yearly Handbook at the time of Sonoiki's attendance, which enumerated the College's conduct rules and disciplinary procedures. <u>Id.</u> ¶ 10. These rules prohibited students from sexually assaulting other students. The Handbook contains a section called "General Regulations: Assault and Other Sexual Misconduct," which states: "the Faculty of Arts and Sciences will not tolerate sexual

misconduct including rape and other forms of sexual assault." Doc. No. 146-2 at 5. The

Handbook also defined the meaning of the term "rape" as used in the conduct rules. Doc. No.

146-3 at 5–6. All reasonable students would therefore understand that the contract prohibited

them from sexually assaulting their peers, and Sonoiki does not claim otherwise.

Next, all reasonable students would understand that Harvard would be the one to

determine: (1) whether a student violated the conduct rules; and (2) the consequences of any

violation. The contract documents plainly vest authority in the Faculty Council to determine

whether a student has earned a degree, i.e., satisfied the conditions precedent under the contract.

Doc. No. 146-5 at 3. The contract gives the Ad Board the authority to adjudicate disciplinary

cases as well as to impose discipline short of dismissal or expulsion. Doc. No. 146-4 at 10.

Finally, all reasonable students would conclude that Harvard reserved the right to order dismissal

or expulsion in serious disciplinary cases. While the contract makes clear that dismissal and

expulsion are not common, but rather are imposed only in the "rarest of circumstances," Doc.

No. 146-6 at 2, all reasonable students would understand that these rare circumstances could

include substantiated allegations of rape or sexual assault. Indeed, the very rule prohibiting rape

and sexual assault states: "A student who commits rape, sexual assault or other sexual

misconduct is subject to *severe* penalties under the rules of the Faculty of Arts and Sciences."

Doc. No. 146-3 at 5 (emphasis added).

To summarize, an objectively reasonable student reviewing the contract would fairly

expect that: (1) he would be subject to Harvard's conduct rules until the moment his degree was

conferred; (2) compliance with these rules is a condition precedent to earning a Harvard degree;

(3) these rules prohibited rape and sexual assault; (4) Harvard would determine whether he

violated the conduct rules; and (5) if Harvard determined he violated the conduct rules, then

Harvard would determine the appropriate consequence, which could include dismissal. Here, Harvard found that Sonoiki violated the rules prohibiting sexual assault on multiple occasions, and it determined that dismissal was the appropriate consequence. In short, Harvard did what the contract entitled it to do.

Sonoiki does not challenge the foregoing, nor does he argue that Harvard violated any of the foregoing terms of the contract. Instead, he contends that the contract precluded Harvard from withholding his degree because the Ad Board failed to issue a formal charge against him prior to May 30, 2013, and because the Ad Board allowed him to participate in commencement ceremonies. Put another way, Sonoiki contends that Harvard acted too late to withhold his degree and, therefore, lost jurisdiction to adjudicate the complaints against him. Sonoiki is incorrect.

At the outset, the undisputed facts establish that Harvard can revoke a previously issued degree based upon its determination that the graduate, while a student, violated Harvard's policies.[29] Doc. No. 162-1 ¶¶ 57–58. Here, no one disputes that Harvard determined: (1) that Sonoiki violated its policies; and (2) that dismissal was the appropriate consequence. Harvard acted in a circumstance where Sonoiki had completed all his academic coursework, as it does when it revokes graduates' degrees. Nothing before the Court demonstrates or suggests that Harvard applies a different standard for revocations as compared to dismissals. Even if Sonoiki were correct in stating that he was entitled to a degree on May 30, 2013—and he is not, for reasons the Court will explain—he has not established a *present* contractual right to the degree, because Harvard was free to proceed with a post-commencement revocation identical to the

_____

[29] Sonoiki "disputes" these assertions but offers no evidence in support of his position. He merely notes, correctly, that his case did not involve the revocation of a previously issued degree. That response does not dispute Harvard's factual assertions regarding its authority to revoke a degree or that it has done so.

proceeding it conducted.[30] This reason alone entitles Harvard to summary judgment on Sonoiki's charge theory.

Sonoiki's charge theory also fails for a separate and independent reason. As determined on summary judgment, Sonoiki fails to establish that a factfinder could endorse his interpretation of the contract as one an objectively reasonable student would fairly reach. This conclusion arises in the context of the full factual record, which was not before the Circuit. The summary judgment record establishes the following material facts.

Ellison told Sonoiki that "a number" of students had made statements accusing him of sexual misconduct, and that the allegations were of "great concern" to the College. Doc. No. 145-3 at 91. Sonoiki then "pleaded" with Cindy to refrain from filing a complaint. Doc. No. 145-102 at 74. Johnson also told Sonoiki that the charges were "more serious" than he appreciated. Id. at 67. Cindy and Ann both filed formal complaints against Sonoiki just two days before Commencement Day. Doc. No. 162-1 ¶ 73. Cindy alleged Sonoiki had raped her just three weeks prior. Doc. No. 145-9 at 15. Ann alleged Sonoiki had raped her in September 2011 by having sex with her while she was passed out, something she first brought to the attention of Harvard administrators in June 2012, resulting ultimately in her complaint on May 28, 2013. Doc. No. 145-7 at 11–12.

Ellison and Johnson sent Sonoiki multiple emails on May 28 and 29, 2013, notifying him of the formal complaints and explaining that Harvard would delay the conferral of his degree pending the outcome of the disciplinary process. Doc. No. 145-8 at 2; Doc. No. 145-12 at 2;

---

[30] Sonoiki contends that the Ad Board lost jurisdiction over him on Commencement Day. He is wrong. The Faculty Council can recommend that previously awarded degrees be revoked. Doc. No. 162-1 ¶ 57. Nothing in the contract prevents the Faculty Council from referring such a matter to the Ad Board for investigation or a recommendation.

Doc. No. 145-3 at 85. Sonoiki replied to at least one of Ellison's emails before he attended

commencement ceremonies. Doc. No. 162-1 ¶ 90. Sonoiki spoke to Johnson at commencement,

and she informed him that his degree would not be in the envelope he received during the

ceremony. Id. ¶ 83. The Ad Board had not issued any charges against Sonoiki at this time or

even had a meaningful opportunity to initiate the first phase of its process after the filing of the

complaints. Id. ¶ 156.

In this context, Sonoiki contends the contract entitled him to obtain his degree on May

30, 2013. The Court starts with the Circuit's ruling on this issue:

> Because the contractual language about when Harvard will withhold a degree was
> ambiguous on its face and because we need not resolve ambiguities in contract
> language at the motion to dismiss stage, we conclude Sonoiki plausibly alleged he
> reasonably expected his degree would issue at the graduation ceremony and
> therefore has plausibly alleged Harvard breached the contract between them when
> it withheld his degree before issuing any disciplinary charges.

Sonoiki, 37 F.4th at 706 (citation omitted). The Circuit found the terms "charge" and "case" to

be ambiguous, id. at 705–06, thereby, at the Rule 12(b)(6) stage, rejecting Harvard's argument

that the language of the Student Information Form saying "[a] student cannot receive a degree

before a pending disciplinary case is resolved," defeated Sonoiki's charge theory. Id. at 706. The

Circuit further declined to resolve the ambiguities it identified and concluded, given said

ambiguities, that Sonoiki had plausibly alleged he reasonably expected to receive his degree on

May 30, 2013. Id.

Now, Sonoiki must make a more demanding showing. He must present competent

evidence permitting a jury to conclude that he was *entitled* under the contract to the degree on

May 30, 2013. Moreover, he must make this showing on the fully developed factual record.[31]

---

[31] The factual record before the Circuit was comparatively sparse, based necessarily only on the
allegations of the Complaint. Doc. No. 1. Those allegations did not contain information revealed
during discovery, including: (1) the details of what Ellison told Sonoiki during their May 17,

Under Massachusetts law, "the interpretation of an unambiguous contract is a question of law for the court, as is the initial determination of whether an ambiguity exists." Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 261 (1st Cir. 2010) (citing Basis Tech. Corp. v. Amazon.com, Inc., 878 N.E.2d 952, 958–59 (Mass. App. Ct. 2008)). "Provisions are not ambiguous simply because the parties have developed different interpretations of them." Basis Tech. Corp., 878 N.E.2d at 959. Genuine ambiguity requires language susceptible of more than one meaning so that "reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998) (citing Jefferson Ins. Co. of N.Y. v. City of Holyoke, 503 N.E.2d 474, 476 (Mass. App. Ct. 1987)). "Even if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context." McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004) (applying Massachusetts law). "'[T]he question whether a provision can reasonably support a proffered interpretation is a legal one, to be decided by the court.'" Pac. Indem. Co. v. Deming, 828 F.3d 19, 23 (1st Cir. 2016) (quoting Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 556 (1st Cir. 1995)).

Sonoiki's interpretation, which requires Harvard to give him a degree because no charge had issued as of May 30, 2013, is not a reasonable interpretation of the contract "in context."

---

2013, meeting; (2) the fact or substance of Ellison's follow-up letter to Sonoiki; (3) Sonoiki's concession that Johnson advised him the informal complaints were serious and involved more than merely hugging others too long, Doc. No. 145-102 at 67; (4) the fact or substance of the emails Ellison and Johnson wrote to Sonoiki two days before Commencement Day telling Sonoiki of the charges and that he would not receive his degree on May 30, 2013, Doc. No. 162-1 ¶¶ 74–92; (5) the fact that Sonoiki, prior to graduation, responded to Ellison's email requesting an "immediate" meeting; (6) the fact that Johnson told Sonoiki the day of commencement that he would not be receiving his degree, id. ¶ 83; (7) the specific details of the allegations made on May 28, 2013, by Ann and Cindy; (8) the fact that Harvard can revoke degrees from graduates based on misconduct committed while they were students, id. ¶ 57; and (9) the course of conduct by the parties under the contract, as described later in this section of the text.

<u>McAdams</u>, 391 F.3d at 299. Several principles of contract interpretation support this conclusion. First, Sonoiki has not, and cannot, point to any express language in the contract entitling him to the degree. Rather, he infers the right primarily from his good-standing status throughout May 2013, the absence of a formal "charge" against him as of Commencement Day, and one sentence from the contract stating that Harvard will not award a degree while a "charge is pending." Doc. No. 146-4 at 8.

Second, the other terms of the contract run counter to Sonoiki's interpretation. <u>Minturn v. Monrad</u>, 64 F.4th 9, 15–16 (1st Cir. 2023) (holding contract language must be considered "as a whole" and not "in a vacuum"). The structure of the contract provides that a student earns a degree at the end of the contract term, after fulfilling the conditions precedent required by the contract. <u>See</u> Doc. No. 146-4 at 8. In the case of peer disputes, the contract provides an extra measure of process by providing for an initial, more limited investigation prior to a charge. Doc. No. 146-7 at 3. Moreover, the contract provides no statute of limitations on disciplinary charges or any other similar timing rules that might apply here. <u>See</u> Doc. No. 146-4 at 4–14 (outlining general regulations regarding the Ad Board). Deferring award of the degree, as Harvard did, pending the outcome of the disciplinary process comports comfortably with these other contract terms. In contrast, Sonoiki's interpretation is at odds with both the obligations and rights of the parties under the contract as well as the format of the disciplinary process. The contract required him to comply with the conduct rules throughout his time at Harvard as a condition precedent to receiving the degree. It also empowered Harvard to determine whether Sonoiki did so and, if not, the consequence to impose. Sonoiki's construction of the contract either removes a condition precedent to the conferral of a degree (i.e., Harvard certifying compliance with the conduct rules

up to commencement) or requires omitting the very process Harvard established for peer disputes (i.e., the two-phase approach that begins with a limited initial investigation).

Third, evaluating the expectations of a student in the particular factual context presented on May 30, 2013, further undermines Sonoiki's construction. See Stonehill, 55 F.4th at 316–17 (considering whether expectations of a student are "reasonable"); see also McAdams, 391 F.3d at 299. The context substantially magnifies the contract considerations noted above. Cindy alleged Sonoiki committed a very serious offense. Doc. No. 145-9 at 4, 14–15. She filed the allegation two days before Commencement Day. Id. Her allegation arose from conduct that occurred just three weeks earlier, and aspects (though not the core allegation) were buttressed by almost contemporaneous medical records and conversations with a Harvard official. Id. at 4, 42. Over the period from May 17 to May 30, 2013, Sonoiki received prompt notice: of the possibility of allegations; that Harvard had great "concerns"; that the conduct was "more serious" than he seemed to believe; that complaints had been filed; that Harvard was delaying the conferral of his degree; that the Dean needed to see him "immediately"; and that his degree would not be in the envelope when he participated in the commencement ceremony on May 30. In the relevant context of the present dispute, both Sonoiki and Harvard faced two serious allegations of misconduct filed on the eve of Sonoiki's Commencement Day, one of which was also facially corroborated in part by external documents arising from very recent events.

No reasonable student confronted with this set of circumstances would read the one sentence Sonoiki highlights (or the entire contract) in the manner he urges.[32] Sonoiki's reading

---

[32] Though Harvard's inconsistent usage of "case" and "charge" renders the contract facially ambiguous, Sonoiki, 37 F.4th at 706, in context on the full factual record, no reasonable student would read the contract as entitling Sonoiki to a degree on May 30, 2013, based upon this facial ambiguity for all the reasons set forth in the text.

would have required Harvard to either: (1) give him a degree on May 30, 2013, despite an unadjudicated allegation of serious misconduct; or (2) skip the entire preliminary investigation and charge him sua sponte.[33] In context and on this record, Sonoiki's interpretation is unreasonable. Cf. Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001) (noting the importance of reading a contract in a manner that "carries out what one might imagine to be a plausible objective" of the parties). The first path would defeat two important substantive purposes of the contract: to ensure that students comply with conduct rules throughout their entire time at Harvard, and to ensure that Harvard degrees accurately certify that fact. The second path harms respondent students who ordinarily benefit from the slower, more careful process resulting from both a preliminary and final investigation. Indeed, not all complaints filed by students result in charges. Doc. No. 146-7 at 2. An objectively reasonable student would not fairly understand the contract as requiring either result that follows from Sonoiki's interpretation.

Finally, the parties' course of conduct undisputedly supports Harvard's interpretation of the contract. Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 910 n.21 (Mass. 2008) (concluding that the parties' conduct is relevant when interpreting an ambiguous contract). Under Massachusetts law, extrinsic evidence may be used as an interpretive guide when contract language is facially ambiguous. Id. at 908. Here, the course of conduct between the parties admits of only one viewpoint: that the Ad Board was qualified to investigate the charges against Sonoiki and withhold the conferral of his degree pending the outcome of its investigation. At no point in nineteen months of disciplinary proceedings did Sonoiki ever argue that the contract entitled him to conferral of his degree on May 30, 2013, or that the Ad Board lacked jurisdiction

---

[33] The contract gives the Ad Board authority to independently initiate a charge against a student. Doc. No. 146-4 at 7.

over him.[34] He authored numerous statements to the Ad Board and the Faculty Council during this period. He had opportunities to evaluate and state the contractual rights he now asserts.

During this time, Sonoiki was not a student arguably isolated in, and dependent upon, Harvard; rather, he was living in New York City working for Goldman Sachs. Doc. No. 162-1 ¶¶ 234–37. His conduct over this period speaks to the view he held then: that Harvard could defer conferral of his degree pending the adjudication of the disciplinary complaints made against him. The absence of any assertion (or behavior) supporting his present interpretation serves as evidence supporting Harvard's construction of the contract. The fact that Harvard proceeded to delay Sonoiki's degree conferral signals its identical view—as does the fact that this is a standard operating practice for Harvard. Harvard's Dean of Student Services, Michael Burke, testified as follows:

> Q: Under what circumstances may names be removed [from the list of students the faculty considers for awarding degrees]?
>
> A: Circumstances such as pending disciplinary cases, failure to pay term bill, failure to meet degree requirements.

Doc. No. 164-11 at 21.

In short, while a disciplinary case is pending, Harvard delays the conferral of the respondent student's degree.[35] Sonoiki points to no extrinsic evidence giving rise to an inference supporting his interpretation of the contract as requiring Harvard to issue his degree on May 30,

---

[34] Proceedings stretched from the filing of the first disciplinary complaints on May 28, 2013, until the day the Faculty Council voted to dismiss Sonoiki from Harvard College on December 10, 2014. Doc. No. 162-1 ¶¶ 73, 220.

[35] In interpretating the meaning of the word "case" as used *by Burke*, the Court looks to Burke's testimony. Burke stated that all disciplinary "case[s]" begin with "an allegation" of wrongdoing, and an initial review when a peer makes the allegation. Doc. No. 164-11 at 7. This is unambiguous testimony establishing that Burke used the term "case" to encompass the disciplinary process beginning with the filing of a complaint by a peer. It also establishes Harvard's view, because he was the Rule 30(b)(6) deponent. Id. at 2. These conclusions are separate and independent of whether the contract's use of the term "case" is facially ambiguous.

2013. Accordingly, for all these reasons, the Court concludes that Sonoiki failed to establish that he was entitled to a degree under the contract on May 30, 2013.

Two more points bear comment here. Subjectively, Sonoiki expected to receive his degree on May 30, 2013, until Johnson informed him that his degree would not be in the envelope he received during the ceremony. Sonoiki's ongoing expectation to receive his degree was not grounded in a reasonable student's fair interpretation of the contract. The charges against him were serious. While the contract documents stated that dismissals from Harvard College were a rare event, Doc. No. 146-6 at 2, that rape or sexual assault could constitute such an event is plain, especially when Harvard's rules warned that rape or sexual assault could lead to "severe penalties," Doc. No. 146-3 at 5. Sonoiki may have personally believed that Harvard would not actually impose the ultimate punishment, even if he was found responsible for the charged conduct. But that personal belief neither entitles Sonoiki to a trial nor authorizes a jury to find in his favor. The material issue before the Court is whether an objectively reasonable student would fairly read the contract as entitling Sonoiki to a Harvard degree in the factual context of May 30, 2013. No reasonable student would reach such a conclusion.

Moreover, though the constitutional presumption of innocence does not apply here,[36] the principles underlying the presumption support Harvard's approach. Harvard permitted Sonoiki to participate in commencement ceremonies while proceeding thereafter with the ordinary preliminary investigation outlined in the contract. This more limited initial inquiry offered the possibility of termination of the complaint without the issuance of a charge or the initiation of a

---

[36] Of course, Sonoiki did not receive the benefit of the panoply of rights accorded by the Constitution to defendants in criminal cases, including the right to confront the witnesses against him, the right to cross-examine the witnesses, the right to the assistance of counsel, the right to a public trial, or the right to a determination by a jury applying the reasonable-doubt standard of proof.

full investigation. The preliminary investigation minimizes the burden on respondent students and maintains greater confidentiality in the context of peer disputes, unless or until the Ad Board determines that the allegations warrant a full investigation. In contrast, Sonoiki's interpretation risks incentivizing Harvard to forego the initial investigation, a course that generally would be to the detriment of respondent students like Sonoiki.

V.    <u>CONCLUSION</u>

For the foregoing reasons, Harvard's Motion for Summary Judgment, Doc. No. 143, is ALLOWED. Considering the Court's ruling on this Motion, it need not resolve the parties' dispute over the admissibility of damage experts. Thus, the Motions to Limit Testimony, Doc. Nos. 123 and 157, are DENIED AS MOOT in light of the ruling on the Motion for Summary Judgment. Judgment shall enter separately, with each side bearing their own fees and costs.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge