No. 24-1177

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

DAMILARE SONOIKI,

Plaintiff – Appellant,

v.

HARVARD UNIVERSITY; HARVARD UNIVERSITY BOARD OF
OVERSEERS; THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Defendants – Appellees.

On Appeal from the United States District Court
for the District of Massachusetts

**REPLY BRIEF FOR THE PLAINTIFF-APPELLANT
DAMILARE SONOIKI**

Damilare Sonoiki
(281) 389-7519
damilare.sonoiki@gmail.com
7627 Aimua Ct.
Houston, TX 77083

March 31, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION............................................................................1

ARGUMENT...................................................................................1

   I.    THE DISTRICT COURT FAILED TO APPLY THE CORRECT
       LEGAL STANDARDS....................................................................1

   II.   THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY
       JUDGMENT ON SONOIKI'S DISCIPLINARY PROCESS
       THEORIES....................................................................................7

        A. The Undisputed Facts Support Sonoiki's Duty-To-Advocate
           Theory......................................................................................7

        B. The Undisputed Facts Support Sonoiki's Witness-Name
           Theory....................................................................................13

        C. The Undisputed Facts Support Sonoiki's Breach-Of-Confidentiality
           Theory....................................................................................17

        D. The Undisputed Facts Support Sonoiki's Initial-Meeting
           Theory....................................................................................19

        E. The Undisputed Facts Support Sonoiki's Cumulative-Error
           Theory....................................................................................21

   III.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY
       JUDGMENT ON SONOIKI'S DEGREE THEORY............................23

        A. Harvard Had No Contractual Right to Withhold Sonoiki's Degree
           Absent a Pending Disciplinary Charge.........................................23

        B. Sonoiki's Present Contractual Right to His Degree is
           Irrelevant...............................................................................29

CONCLUSION...............................................................................34

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................2

*Astra USA, Inc. v. Bildman,* 914 N.E.2d 36 (Mass. 2009).......................23

*Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897 (Mass. 2008)............................28

*Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24 (Mass. 2016) ................................5

*Constable v. National S.S. Co.*, 154 U.S. 51 (1894) ...............................24

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)................................10

*Doe v. Brandeis Univ.*, 20-CV-12162-AK (D. Mass. Feb. 8, 2023)................3, 4, 5

*Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016)...........................6

*Doe v. Stonehill College*, No. 21-1227 (1st Cir. 2022)...........................22

*Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018).....................3, 4, 5

*Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011)*.....................28

*Fishman v. LaSalle Nat. Bank*, 247 F.3d 300 (1st Cir. 2001)................................17

*Happ v. Corning, Inc.*, 466 F.3d 41 (1st Cir. 2006).........................24, 25

*Mesnick v. Gen. Elec. Co.*, 950 F.2d 816 (1st Cir. 1991)....................3, 4

*Minturn v. Monrad,* 64 F.4th 9 (1st Cir. 2023) .....................................23

*Rodley v. Commonwealth, No. 96-977, 2000 Mass. Super. LEXIS 308 at *3 (Mass. Sup. Ct. Aug. 3, 2000)*...........................................................24

*Scott v. Harris,* 550 U.S. 372 (2007) ......................................19

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.,* 188 F.3d 11 (1st Cir. 1999)...19

*Sonoiki v. Harvard Univ.*, 37 F.4th 691 (1st Cir. 2022).................................passim

*Sonoiki v. Harvard Univ.*, Civil No. 19-12172-LTS, (D. Mass. Feb. 6, 2024)................................................................passim

*Thiersaint v. Dep't of Homeland Sec.*, 85 F.4th 653 (1st Cir. 2023)......................2

*Trafton v. Custeau*, 338 Mass. 305 (1959).............................................28

# INTRODUCTION

Harvard's Response Brief rests on fundamental misunderstandings of this Court's precedent, the summary judgment standard, and principles of contract interpretation. First, Harvard asks this Court to disregard the precedent established in this Court's ruling, which held that a "student's expectation can be reasonable even if the precise expectation is not stated explicitly in the contract's language." *Sonoiki v. Harvard Univ.* ("*Sonoiki I*"), 37 F.4th 691, 709 (1st Cir. 2022).

Second, Harvard attempts to transform summary judgment from a screening device for triable issues to a requirement that plaintiffs conclusively prove their case before trial; but the summary judgment standard requires only that Sonoiki present evidence creating genuine issues of material fact.

Third, Harvard misapplies principles of contract interpretation, asking this Court to ignore Harvard's policy language and inventing post-hoc justifications that contradict Harvard's conduct, testimony, and prior legal positions.

Because the record contains evidence that creates genuine issues of material fact regarding Harvard's contractual breaches and their resulting harm, this Court should overturn the District Court's order granting summary judgment.

# ARGUMENT

## I. THE DISTRICT COURT FAILED TO APPLY THE CORRECT LEGAL STANDARDS

Summary judgment requires courts to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Thiersaint v. Dep't of Homeland Sec.*, 85 F.4th 653, 657 (1st Cir. 2023); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court repeatedly violated this principle, and Harvard's response perpetuates this error.

First, the court viewed evidence in the light most favorable to Harvard by minimizing evidence of Johnson's conflict of interest. Johnson wrote to Ellison that she felt "very close to Betty," that "it might be better for [Sonoiki] to work with someone else," and that it was "hard to balance conflicting needs." App. 756[1]. The court dismissed this situation as a "conflict" in quotes and described the situation as merely a "possible conflict of interest." *Sonoiki v. Harvard Univ.*, Civil No. 19-12172-LTS ("*Sonoiki II*"), (D. Mass. Feb. 6, 2024), at 25.

The court also viewed evidence in the light most favorable to Harvard by disregarding evidence that Johnson failed to fulfill her duties regarding written initial statements. Harvard and the District Court's minimization of this failure is inexplicable given that the Student Information Form states, "[t]he statement is among the most important documents considered by the Board in a case and is the

---

[1] "Add." citations refer to the Addendum to Plaintiff's Opening Brief, which is cited as "OB." "App." refers to the Appendix to same. "SA" refers to the Supplemental Appendix. "RB" citations refer to Harvard's Response Brief. "SSA" refers to the Second Supplemental Appendix.

first opportunity [the respondent has] to describe the event and respond to the allegation." Add 63. Sonoiki's testimony that "all [Johnson] really did was kind of, hey, tweak this, that, and . . . ask for bathroom breaks" creates a genuine dispute as to whether Johnson provided the guidance a student could reasonably expect. App. 843. Harvard's claim that Sonoiki waived this argument is meritless. RB 33. Sonoiki has consistently argued that Johnson failed to advocate for him. Sonoiki's example of Johnson's lack of feedback on written statements is not a new theory, but supporting evidence for an existing theory.

Harvard compounds these legal errors by mischaracterizing Sonoiki's arguments. Harvard claims that Sonoiki argues that the *Mesnick v. Gen. Elec. Co*., 950 F.2d 816 (1st Cir. 1991) "definite, competent evidence" standard applies only to employment discrimination. RB 25. Yet Sonoiki acknowledges that this standard applies to campus discipline. OB 19. Harvard also claims that Sonoiki contends that this Court and the District Court declined to apply the *Mesnick* standard in *Doe v. Trustees of Boston College ("BC")*, 892 F.3d 67 (1st Cir. 2018) and *Doe v. Brandeis University ("Brandeis")*, 20-CV-12162-AK (D. Mass. Feb. 8, 2023), respectively. RB 25. Yet Sonoiki cites these cases as examples of the proper application of the *Mesnick* requirement and as precedents that support reversal. Harvard also falsely claims that Sonoiki "asks the court to disregard or relax" the

*Mesnick* requirement. *Id*. Rather, Sonoiki seeks what *BC* and *Brandeis* prove, that the evidence on the record satisfies the *Mesnick* requirement.

In *BC*, this Court found triable issues based on two factors: (1) an administrator's comment to the chair of an investigative Board that "no finding"[2] determinations were "discouraged" and (2) an instruction from an administrator to put an alternative suspect "at ease." *BC*, at 86-87. This Court did not require the plaintiff to conclusively demonstrate that the "no finding" or "at ease" comment affected the outcome of the proceedings. *BC*, at 86-87. In *Brandeis*, the District Court found summary judgment inappropriate because the scope of an administrator's involvement in an investigation potentially fell outside the student's reasonable expectations. *Brandeis*, at 20. The court did not require the plaintiff to demonstrate with certainty that this expanded role changed the outcome of the investigation. *Brandeis*, at 18-19.

The court here imposed a higher standard. Regarding Johnson's failure to share notes, the court required Sonoiki to "demonstrate that sharing the notes: (1) would have revealed something he did not already know; (2) would have resulted in him doing something differently in the course of the disciplinary processes; or (3) otherwise affected the outcome of the disciplinary process." *Sonoiki II*, at 24.

---

[2] The Board could could reach one of four determinations: responsible, not responsible, no finding, or responsible for a lesser included charge.

Regarding witness identities, the court held that Sonoiki failed to show that had he known the identities during the proceedings, "he would have undertaken different or more investigative efforts, communicated additional or different information to the Ad Board, refrained from sharing certain information with the Ad Board, or done anything else differently." *Sonoiki II*, at 30. Yet the question at summary judgment is not whether Sonoiki can conclusively prove causation, but whether a rational jury can conclude that these breaches affected the outcome. *BC* and *Brandeis* demonstrate that a rational jury could make that finding. Further, Harvard cites *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 40 (Mass. 2016) to show that a breach-of-contract plaintiff in Massachusetts must prove that he "suffered harm as a result of" the breach. RB 27. But Harvard ignores *Bulwer's* holding that whether the plaintiff was harmed "is a question of fact for the jury." *Id*. The court's demand for conclusive proof of harm contradicts this principle.

Notably, the District Court imposed this higher standard even as the breaches in *Sonoiki* are more impactful than those that survived summary judgment in *BC* and *Brandeis*: 1) Johnson failed to share witness names. App. 844. 2) She failed to attend initial meetings. App. 750, 833, 835. 3) She downplayed Sonoiki's situation. App. 758, 763, 861-862. 4) She failed to help Sonoiki formulate written statements. App. 842-844. 5) She had an undisclosed conflict of interest. App. 755-756, 833, 879. 6) She failed to share meeting notes. App. 760, 851, 854-855. 7)

Harvard lacked jurisdiction. App. 69, 809, 879. 8) Administrators took on expanded roles, pressuring individuals to make complaints while overseeing the adjudicatory process. App. 821-822.

The court's approach to harm is particularly flawed when viewed alongside *Doe v. Brown Univ.*, 210 F. Supp. 3d at 336. Notably, *Brown* involved a bench trial, not summary judgment. Further, *Brown* acknowledged that how a procedural error affects an outcome "is extremely difficult to know with any certainty." *Brown,* at 336. Yet the District Court demanded this certainty from Sonoiki at the summary judgment stage, when all reasonable inferences must be drawn in Sonoiki's favor.

Moreover, *Brown's* finding of harm was based on evidence about the panel's deliberations, such as their length and members' descriptions at trial of the case as "difficult." *Id*, at 335 - 336. This evidence is unavailable to Sonoiki as the Ad Board process is shrouded in secrecy, forcing Sonoiki to prove how violations affected deliberations while withholding information about those deliberations. The length of Sonoiki's Ad Board process suggests complex deliberations, a reasonable inference that must be drawn in Sonoiki's favor. The Student Information Form states, "[t]he entire [Ad Board] process, from start to end, ordinarily takes between 3 to 6 weeks." Add. 61. Sonoiki's process took nearly two years: six months from complaint to recommendation and another thirteen until dismissal.

## II.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON SONOIKI'S DISCIPLINARY-PROCESS THEORIES

**A. The Undisputed Facts Support Sonoiki's Duty-To-Advocate Theory**

Harvard mischaracterizes Sonoiki's advocacy argument, claiming Sonoiki contends that "Johnson had advocacy duties akin to an attorney." RB 28. The court also employed this strawman, stating "no reasonable student would think the Board Representative is an advocate in the sense of the commonly understood role of a criminal defense attorney." *Sonoiki II*, at 23. But Sonoiki has never made this argument: "Sonoiki does not argue that Johnson failed to provide the advocacy required of a criminal defense attorney, but that Johnson failed to provide the advocacy required of a Board Representative." OB 15. Harvard mischaracterizes Sonoiki's argument because the record shows that Johnson did not provide the advocacy required of her role.

First, Johnson concealed a conflict of interest that compromised her ability to represent Sonoiki. App. 755-756. Harvard claims that "no contractual provision could create a reasonable expectation that a Board Representative would not have a 'conflict'" RB 36. But this claim is false. The Student Information Form states, "*if you believe your resident dean is not the best person to assist you with the case*, you may choose any other voting member of the Board." Add. 63 (emphasis in original). Sonoiki testified that had he known of the conflict, he would have chosen a different Representative. App. 881. Johnson's failure to disclose the conflict thus deprived Sonoiki of information needed to choose a Representative. Notably,

Johnson told Sonoiki that she "was confident [she] could serve well as [his] Board Representative," an entirely different attitude than she expressed to Ellison. SA1619, App. 755-756. Further, Harvard's position contradicts Johnson's actions. Her email shows that she, an Ad Board member, recognized what Harvard denies: that students can reasonably expect unconflicted representation. App. 755-756.

Several other provisions support the reasonable expectation that a Board Representative cannot have a conflict like Johnson's. The Student Handbook states that "[t]he College's investigation and adjudication process is designed to be careful and fair" and that "it is the responsibility of all members of the academic community . . . to give full and fair hearing to reasoned expressions of grievances." Add. 49. The General Information form declares that the Ad Board's decisions are "guided by . . . considerations of equity," that "[e]very effort is made to provide fair treatment of each undergraduate relative to all other undergraduates," and that "the procedures for resolving disciplinary cases are designed to ensure that students are given a fair opportunity to be heard." Add. 68. A rational jury could conclude that Johnson's conflict deprived Sonoiki of these guarantees. App. 755-756. Further, Betty receiving support from both her Representative and Sonoiki's violates these promises.

To justify this breach, Harvard claims that Sonoiki "knew that Betty was in Johnson's House" and knew that "Johnson had been Betty's Board Representative"

in a separate Ad Board matter. RB 36. Harvard claims that this knowledge means Sonoiki knew that Johnson and Betty were close. *Id*. This argument fails. First, each House[3] has hundreds of students. That a student resides in a certain House does not establish that the student has a close relationship with the House's Resident Dean. Second, the evidence of Sonoiki's supposed knowledge consists entirely of Johnson's statement that "[Sonoiki] had already knew that I had worked with Betty. That was something that Betty had disclosed to [Sonoiki]." SA1619. Johnson gives no basis for her knowledge of what Betty allegedly told Sonoiki. Finally, even if Sonoiki knew that Johnson had worked with Betty, this knowledge is not equivalent to knowing that Johnson felt "very close to Betty" and believed "it might be better for [Sonoiki] to work with someone else." App. 755-756.

Harvard claims Sonoiki "has pointed to no evidence showing that Johnson breached her duties because of the alleged conflict." RB 38. This claim ignores substantial evidence. First, Johnson's failures occurred after she expressed her conflict. App. 755-756. Second, Johnson's failures—withholding witness names, providing minimal assistance with written statements, failing to share meeting notes, and minimizing the seriousness of his situation—benefited Betty and disadvantaged Sonoiki. App. 760, 842-844, 851, 854-855, 763, 861-862. A reasonable jury could conclude that her conflict caused these breaches.

---

[3] Harvard students are sorted into one of several residential Houses

Further, the conflict is especially harmful given the nature of Johnson's role. As this Court recognized, "no other person—not the student or a lawyer—could be present at the full Ad Board adjudicatory meeting to advocate firsthand for the student." *Sonoiki I*, at 711. Harvard characterizes this argument as an attempt to seek an exception from the need to show harm. RB 38. Yet Sonoiki is not seeking such an exception, but instead highlighting how the nature of Johnson's role made her conflict particularly damaging. Citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980), Harvard argues that a "possible conflict certainly cannot interfere with a non-judicial, pedagogical university disciplinary proceeding" if it wouldn't "undermine a criminal conviction." RB 38. But this matter concerns a real, stated conflict, not a possible conflict. Additionally, the absence of procedural protections makes undivided loyalty more critical, not less, than in a matter like *Cuyler*.

Johnson also failed to advocate by downplaying developments in the proceedings. Harvard attempts to rebut this pattern by pointing to Johnson telling Sonoiki that the allegations were "more serious" than he appreciated. RB 32. But this argument fails given the context of that comment. Sonoiki testified that he initially thought that the allegations might concern misconstrued "hugging" and that Johnson told him that the situation was "more serious" than "someone that you hug for too long." SA1728. That allegations are "more serious" than a hug does not suggest that the allegations are worthy of dismissal from the College.

Harvard also attempts to rebut Johnson's pattern of minimization by noting that two of Sonoiki's examples of Johnson's minimization are true statements: that a charge issuance is "not a finding" and that Ad Board recommendations are not always followed. RB 33, App. 758, App. 761-763. First, Harvard provides no evidence supporting Johnson's claim about recommendations. Second, the issue is not the accuracy of the statements, but their effect. As Sonoiki testified, the process was like "boiling a frog" with Johnson "minimizing everything . . . at every turn." App. 863. Harvard further attempts to rebut Johnson's minimization by noting that that Johnson urged Sonoiki to consult an attorney and to get support. RB 32. But this advice was accompanied by Johnson's minimizing statements. Further, consulting an attorney was impractical. Campus disciplinary proceedings do not feature public defenders. With three proceedings spanning months, Sonoiki's fees would have reached hundreds of thousands of dollars.

Johnson also failed in her duty to advocate by not substantively helping Sonoiki with written statements. App. 843. Harvard's claim that this argument was waived is meritless. RB 34. Sonoiki has consistently argued that Johnson failed to advocate for him. His examples of her failure are not new theories, but supporting evidence for his core advocacy argument.

Johnson further failed in her duty to advocate by not sharing her meeting notes for meetings Sonoiki was not allowed to attend. App. 760, 851, 854-855.

Harvard attempts to rebut this breach by claiming that Johnson tried to share her notes, but Sonoiki refused them, citing moments when Sonoiki asked for respite from the process. RB 34-35. First, Sonoiki requested the notes and did not receive them. App. 851, 854-855. Second, a meeting or phone call was not necessary to transmit the notes as Johnson could have emailed the notes. Third, Sonoiki's requests for mental breaks came during an emotionally difficult process and were temporary. Sonoiki testified that he "was very depressed and . . . traumatized" and that it was pleasant to have "a few weeks to not just have to think about the proceedings." SSA29. A student's need for brief mental health breaks does not absolve a Board Representative of her duties. Further, Harvard's weaponization of these breaks contradicts Johnson's focus on mental health. Sonoiki testified that Johnson "constantly check[ed] in on . . . [his] . . . mental health" (SA1777), encouraging him to "get support." RB 32. Finally, Harvard's position is inconsistent. Harvard disregarded Sonoiki's wishes throughout the Ad Board process, yet now represents these brief, stress-driven requests for respite as though they supersede Johnson's contractual obligations.

Harvard's defense of these myriad advocacy failures rests on the Student Information Form's statement that Board Representatives "will not advocate" for the accused student. RB 28. This argument attempts to relitigate an issue already decided by the this Court, which held that this phrase cannot be read in isolation

and that the descriptions of the Board Representative's role "sensibly suggest some level of advocacy," particularly "when no other person—not the student or a lawyer—could be present at the full Ad Board adjudicatory meeting to advocate firsthand for the student." *Sonoiki I*, at 711. Further, Johnson's emails to Ellison demonstrate that she knew that she had a duty to advocate. App. 755-756.

The court erred in concluding that Sonoiki failed to demonstrate harm. A rational jury could find that having an unconflicted advocate who did not minimize Sonoiki's situation, who provided substantive help with written statements, and who shared notes could have affected the outcome. At minimum, Johnson's misunderstanding of her role—revealed by her emails—creates genuine issues of material fact regarding whether her failures harmed Sonoiki. App. 755-756.

## B. The Undisputed Facts Support Sonoiki's Witness-Name Theory

Harvard's defense of its failure to provide witness identities rests on three flawed premises: that Sonoiki knew witness identities, that his lack of knowledge was his fault, and that he cannot show harm from this breach. Each argument fails.

Harvard's claim that "Sonoiki indisputably knew the witness names" attempts to relitigate a factual determination made by the court, which stated, "[i]t is undisputed that Sonoiki learned some of the names, but Sonoiki denies knowing all of them, which, of course, the Court accepts as true." *Sonoiki II*, at 29. RB 42. Harvard's cited evidence confirms this determination. The citations show that

Sonoiki knew two names: Sarah Rankin and Tom Dan. SA942-943. Sonoiki

testified to this knowledge, declaring that Rankin's name "wasn't redacted," likely

because she was "an employee of the school." App. 848. Sonoiki recalled that Tom

Dan's name appearing unredacted was unusual: "[Tom Dan] is the one that was

unredacted, and . . . I wasn't sure if it was a mistake." SA2031. This testimony

demonstrates that witness identities were generally withheld. Harvard's citations

also show that Sonoiki made an educated guess regarding another witness identity.

SA1151. When asked, based on this guess, if he knew witnesses from context,

Sonoiki testified: "I wouldn't say I knew. . . I wouldn't know for sure." App. 852.

Harvard cites "contemporaneous notes of Sonoiki's interview with the Ad

Board's investigator, Richard Cole" as evidence "that Cole and Sonoiki discussed

the witnesses by name." RB42. SA949, SA966, SA981, SA1099, SA1162,

SA1234. Yet these notes show that Cole knew witness identities, not that Sonoiki

knew. There is no evidence that Sonoiki knew that these were witness names nor

that Sonoiki knew which names corresponded to which statements or testimony.

Harvard erroneously attempts to shift blame to Sonoiki for not aggressively

pursuing witness names. RB 43. Harvard cites Johnson's supposed offers to share

witness details orally, but these offers came after critical stages of the process.

Further, Harvard's policies imposed an affirmative duty on Johnson to provide

witness names, not a duty to theoretically make names available if a student

pressed for them. Additionally, Johnson could have emailed the witness names to Sonoiki at any time. Instead, she withheld them.

Harvard's claim that Sonoiki failed to demonstrate harm from lacking witness identities is meritless. This Court recognized the importance of witness identities. As Judge Thompson said: "it's hard to understand how [Sonoiki] could respond to witness statements if the names of the witnesses [were not provided]." *Sonoiki I* (oral arguments). Further, discovery revealed a web of relationships among witnesses and complainants. Betty's first witness was Cindy. SSA13-14. Cindy's fifth witness was Betty. *Id*. Ann's second witness had a prior sexual relationship with Sonoiki. *Id*. This network of relationships, biases, and circular reinforcement raises credibility issues. Further, Cindy's sixth witness was her romantic interest, and several campus disciplinary matters involve consensual encounters that were recharacterized to avoid a partner's disapproval. SSA14.

The harm from anonymity is clear absent these specific relationships. With real time knowledge of identities, Sonoiki could have: 1) investigated relationships between witnesses and complainants, 2) identified witnesses who had motive to provide false information, 3) discovered inconsistent statements to third parties, 4) found additional witnesses, or 5) developed specific credibility challenges.

Further, the court's approach ignores the reality of litigation. Upon receiving witness identities in discovery, Sonoiki could only address the identities in the

opposition to summary judgment brief or at oral arguments. The brief is page-limited. Oral arguments are time-limited. Neither venue allows for developing an alternative strategy for complex, lengthy, decade-old proceedings. Further, this standard shields institutions from the consequences of procedural violations, allowing them to withhold information, then argue that the student cannot show, within the confines of litigation, how that information would have affected the outcome of the disciplinary process. The proper inquiry at summary judgment is not whether Sonoiki can construct an alternative defense, but whether a reasonable jury could conclude that access to the withheld information could have affected the outcome of the proceedings.

Finally, Harvard's reliance on Sonoiki's failure to raise this issue in his administrative appeal is misplaced. The Ad Board's appeal process was limited to three grounds: "(1) [t]he Ad Board made a procedural error (2) The Ad Board came to the wrong conclusion about whether faculty rules were violated, [and] (3) Based upon a review of the Ad Board's annual disciplinary statistics, the sanction imposed by the Administrative Board was inconsistent with its usual practice in cases and therefore inappropriate." App. 103. None applied to witness anonymity.

## C. The Undisputed Facts Support Sonoiki's Breach-Of-Confidentiality Theory

Harvard's defense of Johnson's breach of confidentiality rests on two flawed premises: that Johnson had no duty of confidentiality and that even if such a duty existed, Sonoiki cannot prove specific breaches. Both arguments fail.

First, Harvard's claim that Johnson had no duty of confidentiality ignores this Court's ruling that "Sonoiki could reasonably expect that some level of confidentiality flowed" from the policy language. *Sonoiki I*, at 711. Harvard's argument, citing *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir. 2001), that Sonoiki's interpretation runs afoul of common sense also fails, as that argument was available to this Court when it ruled.

Harvard cites certain communications to justify Johnson's misunderstanding of confidentiality. This argument fails. Harvard cites an October 2013 email from Ellison stating that that Johnson "will be able to convey to the full Board . . . any information you convey to her." RB 40, SA1082, SA2142-43. Yet this email came after Sonoiki shared sensitive information with Johnson and cannot retroactively modify the reasonable expectations set by Harvard's policies.

Harvard also cites Johnson's testimony that she "made clear to students" that communications were not confidential. RB 40, SA1605. Yet the record contradicts this testimony. The initial documents and meetings contained no warnings about the limits of confidentiality with one's Board Representative. Further, Johnson's testimony demonstrates that she misunderstood her duty. Johnson testified that she

viewed nothing Sonoiki shared as confidential, stating "nothing that Dam said to me was confidential." App. 795. This admission creates a triable issue of fact. This issue is particularly salient given Johnson's close relationship with Betty. App. 755-756. A reasonable jury could conclude that Johnson's divided loyalties and her belief that nothing Sonoiki shared was confidential led her to share Sonoiki's confidences with Betty or with others involved in the proceedings.

Harvard attempts to avoid these damaging facts by arguing that Sonoiki cannot identify any confidential information that Johnson disclosed. RB 41. This argument misunderstands the summary judgment standard. The evidence of Johnson's admitted belief that "nothing that Dam said to me was confidential" combined with her close relationship with Betty creates a genuine issue of material fact about whether confidences were breached. App. 755-756, 795. The law does not require direct evidence of specific disclosures to survive summary judgment when circumstantial evidence creates reasonable inferences.

### D. The Undisputed Facts Support Sonoiki's Initial-Meeting Theory

In its attempt to rebut the initial-meeting theory, Harvard asserts that Johnson "*did* attend [Sonoiki's] initial meeting." (emphasis in original). RB 44. This assertion attempts to relitigate the court's factual determination that "for summary judgment purposes, Sonoiki has established that Harvard breached its duty to have [Johnson] present at the June 3 meeting" and that "[w]hether Johnson

attended the meeting presents an issue of fact that can only be resolved at a trial." *Sonoiki II*, at 31-32. Harvard misapplies *Scott v. Harris* 550 U.S. 372, 380 (2007) and *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp*, 188 F.3d 11, 20 (1st Cir. 1999) to argue that Sonoiki's testimony that Johnson did not attend the meeting creates no "material dispute of fact" because the testimony is "contradicted by contemporaneous documentary evidence." RB 45. This comparison fails. *Scott* involved unambiguous videotape evidence of a high-speed pursuit, and *SMS* addresses situations involving blatant contradictions of the record. The evidence regarding Johnson's attendance is not conclusive.

Harvard questions Sonoiki's failure to raise this issue "before the Ad Board or in his administrative appeal." RB 44. Harvard ignores the fact that at the time, Sonoiki was working full time while processing the ramifications of the dismissal decision without legal representation that could find procedural errors with the rigor applied to the present case. App. 68, 103, SSA29.

Further, Harvard cannot dispute its failure to hold an initial meeting regarding Betty's complaint. The District Court stated, "[a]pplying the summary judgment standard, the Court will presume that the meeting never occurred." *Sonoiki II*, at 31. Rather than address this breach, Harvard claims "Sonoiki does not raise this issue on appeal, so it is forfeited." RB 18 n.5. This assertion is false. Sonoiki raised this issue. OB 5, 15, 24, 57-59.

The court's conclusion that Sonoiki "cannot and does not show that Johnson's presence at the June 3 meeting mattered" misunderstands the summary judgment standard, as does Harvard's assertion that "nothing could have changed" had Johnson been present. *Sonoiki II*, at 32, RB 45. This meeting is a critical point that sets the trajectory of the disciplinary process. Johnson's absence deprived Sonoiki of a neutral perspective as Ellison, who showed bias by soliciting complaints and improperly withholding Sonoiki's diploma, framed the allegations. App. 751-752, 758, 821-822. Sonoiki lost the opportunity to have advocacy at this pivotal moment, as Johnson could have identified procedural concerns or asked questions that shaped the investigation's direction. Additionally, without firsthand knowledge of how the allegations were presented, Johnson was limited in her ability to help Sonoiki craft the initial statements that Harvard's documents describe as "among the most important documents considered by the Board." Add. 63. Her absence also eliminated the natural opportunity for her to disclose her conflict of interest. Sonoiki made critical decisions about his defense without guidance at this step, creating a disadvantage that persisted throughout the process.

Further, Harvard's argument that Ellison fulfilled the "goal" of the meeting by explaining the disciplinary process reduces the Board Representative's role to that of an explainer of rules rather than an advocate who ensures that the student's

perspective is properly shared. RB 45. This view contradicts the acknowledgment in Harvard's policies of the Board Representative's important role. Add. 61 - 67.

Finally, Harvard attempts to diminish the importance of the meeting by quoting Sonoiki's testimony that he "didn't know" what would have changed with Johnson's presence. RB 45. Harvard omits key context. In response to the question, "what would have been different if [Johnson] had attended," Sonoiki replied that he "can't really speculate." SA1770. This is not an admission that nothing would have changed, but a recognition that anything could have changed. The contract required Johnson's presence for a reason, and her absence compromised the procedural integrity that Harvard promised.

### E. The Undisputed Facts Support Sonoiki's Cumulative-Error Theory

The court's dismissal of cumulative error misunderstands this Court's precedent. In *Doe v. Stonehill College*, No. 21-1227 (1st Cir. 2022), this Court recognized that even if individual procedural irregularities might be viewed as "minor deviations" in isolation, their cumulative effect can impact the outcome of disciplinary proceedings. 55 F.4th at 329.

Harvard's response to the cumulative error theory, like the District Court's analysis of the same, consists of a single conclusory paragraph. Harvard states that Sonoiki "offers nothing" to challenge the District Court's assessment that there was no cumulative harm. RB 46. This assertion is false. The evidence shows that

each failure compounded the others, collectively impacting the outcome of the proceedings. Johnson's conflict of interest and confidentiality breach were exacerbated by the fact that Sonoiki did not know witness identities and thus could not investigate whether improper disclosures were occurring. The improper initial meetings worsened Johnson's broader failure to advocate for Sonoiki as these meetings would have established the foundation for effective representation. Johnson's conflict of interest allowed bias to permeate the process caused her to withhold witness identities and meeting notes. The absence of advocacy at initial meetings led to inadequate written responses, which damaged Sonoiki's credibility before the Ad Board. Further, unlike the minor irregularities at issue in *Stonehill*, Harvard's breaches were substantial.

## III. THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON SONOIKI'S DEGREE THEORY

### A. Harvard Had No Contractual Right to Withhold Sonoiki's Degree Absent a Pending Disciplinary Charge

Harvard attempts to justify withholding Sonoiki's degree with canons of construction, ignoring this Court's ruling that "the contractual language about when Harvard will withhold a degree was ambiguous on its face." *Sonoiki I*, at 706. This factual determination constitutes the law of the case and precludes resolution through canons of construction.

Further, Harvard falsely claims that "this Court's pleadings-stage decision did not apply any canons of contract construction." RB 49. This Court stated, "when we consider 'whether a contract is ambiguous, we read the agreement "in a reasonable and practical way, consistent with its language, background, and purpose"'" and "[i]n interpreting contractual language, we consider the contract as a whole. Its meaning cannot be delineated by isolating words and interpreting them as though they stood alone." *Sonoiki I*, at 703-04. Harvard cites *Minturn v. Monrad*, 64 F.4th 9 (1st Cir. 2023) to advance the canon that contracts must be read as a whole, a canon that Harvard claims this Court did not apply. RB 52.

Even considering canon-based arguments, Harvard's position fails. Harvard argues that the Student Information Form controls the Student Handbook based on the principle that specific provisions control general provisions. *Astra USA, Inc. v. Bildman*, 914 N.E.2d 36 (Mass. 2009). RB 51. Yet the Handbook explicitly controls other documents. The Ad Board General Information Form states, "the Administrative Board's decisions are governed by the rules and regulations contained in the Handbook." Add. 69. Further, a later contract controls insofar as the contracts contain contradictory terms. *Constable v. National S.S. Co.*, 154 U.S. 51, 73 (1894), *Rodley v. Commonwealth*, No. 96-977, 2000 Mass. Super. LEXIS 308 at *3 (Mass. Sup. Ct. Aug. 3, 2000). The Student Information Form was issued in 2011, and the Handbook was issued in 2012.

The Student Handbook states that a "degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending." Add. 56. Because the undisputed facts show that as of Commencement Day, Sonoiki was in good standing and had no disciplinary charge or charges pending against him, Harvard cites two sentences in the Student Information Form to support its improper withholding of Sonoiki's degree: "[a] student cannot receive a degree before a pending disciplinary case is resolved" and "a disciplinary case always begins with an allegation of student misconduct in the form of a complaint or report." RB 48, Add. 61, 67. Yet this argument fails. That all cases begin with an allegation does not mean that an allegation itself is a case, and the evidence shows that an allegation on its own does not constitute a case.

Harvard invokes *Happ v. Corning, Inc.*, 466 F.3d 41 (1st Cir. 2006), to argue that Sonoiki's interpretation is unreasonable as it creates disharmony between the Student Information Form and the Student Handbook. RB 50. This argument fails. First, this Court's decision precludes resolution of the "case" versus "charge" ambiguity through canons of construction. Second, the contract itself uses "case" in a manner that precludes harmonious reading. This Court noted that two provisions using the term "case" in separate sections of the Student Information Form are "conflicting" and "suggest that the pending disciplinary 'case' referred to in the Finding section" of the form has a different meaning than "the 'case'

initiated when an allegation is made." *Sonoiki I*, at 709. Third, Sonoiki's interpretation is harmonious: when a complaint is submitted, it constitutes a "matter that is under review" by the Ad Board but is not yet a "disciplinary case." SSA2. Only after the Ad Board issues a charge does the matter become a disciplinary case that triggers degree withholding.

Harvard's documents and actions support this interpretation. First, the June 3, 2013, confidentiality form signed by Ellison addresses Sonoiki as "a principal or witness in a matter that is under review by the Administrative Board, and that may give rise to a disciplinary case[.]" SSA2. The form further states that "[i]f the Administrative Board makes a determination to treat this matter as a disciplinary case, then you will be expected to keep confidential photocopies of statements . . . and any other disciplinary case documents given to you[.]" *Id*. Second, the Student Information Form states that a student with "a pending disciplinary case . . . ordinarily may not participate in commencement or related activities." Add. 67. Sonoiki spoke as the Harvard Orator at Class Day, a commencement-related activity. Harvard posted the speech to its YouTube channel, where the video remains. App. 33. Third, Ellison's email improperly instructing administrators that Sonoiki's degree "not be voted and not be awarded" cites the seriousness of the allegations and the expectation of more allegations as the basis for withholding the degree, not the mere existence of allegations. App. 751-752. Notably, this email

makes no mention of the "preliminary investigation" phase that Harvard now invents to justify its wrongful actions. *Id*. The disciplinary process flowchart and Student Information Form also mention no "preliminary investigation" phase during which degrees are withheld. Add. 61-67, 70.

The testimony of Harvard's Rule 30(b)(6) witness, Michael Burke, also supports Sonoiki's interpretation. This testimony demonstrated Harvard's pattern of creating distinct terms of art, then claiming the terms were synonymous when such a claim benefits Harvard. Burke testified that Sonoiki's situation was an Ad Board "matter." SSA16-26. When confronted with the confidentiality form, Burke became evasive and contradictory. Asked to explain the difference between a "matter" and a "case," Burke testified that "matter is a broader term." SSA19. When asked if there are disciplinary matters that do not give rise to cases, Burke stated "I'm not really sure I see the distinction." SSA20. Asked if the distinction was unclear, he replied that it was "not unclear to me," yet failed to articulate any distinction when asked to do so. *Id*. When asked why the confidentiality form used conditional language if the matter was already a case as of June 3, 2013, Burke responded, "I'm not sure I quite understand that question." SSA21. Asked whether this language meant Sonoiki's situation was not yet a "case" as of June 3, 2013, Burke contradicted Harvard's own document by asserting that the matter "formally

became a case on May 29th." SSA22. This testimony reveals Harvard's inability to reconcile its contemporaneous documents with its litigation position.

Burke further struggled when presented with the contract language regarding degrees. When shown the provision that "[a] degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending," Burke conceded that the provision used the term "charge," not allegation, matter, or case. Add. 56, SSA24. Asked if a charge was different than an allegation, Burke admitted that "a charge is not the same thing as an allegation." SSA25. Further, when pressed about the distinction between "matter" and "case," Burke testified, "[a] case is one example of a matter." *Id*. When asked if all matters are cases, Burke admitted that "[a] matter could be a petition or a case, academic review" and "a case is one example of a matter." *Id*.

The record shows Harvard's inconsistency about Sonoiki's status. On June 4, 2013, Ellison replied to Sonoiki's request to be removed from Harvard's internal directory of students, or "facebook." Ellison wrote, "[w]e can put what is called a flag on your information, I think. One issue is who controls the facebook and from where the feed originates and the other is that you are graduated and I am uncertain how a flag works for a graduate." SSA5. This email contradicts Harvard's current position by acknowledging that Sonoiki graduated. Harvard cannot now claim clarity about Sonoiki's status when its own administrators showed confusion.

When a contract contains ambiguities that cannot be resolved through interpretation, its meaning becomes a question of fact for a jury. *Trafton v. Custeau*, 338 Mass. 305, 307-08 (1959). Harvard notes that extrinsic evidence can resolve an ambiguity. *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008). RB 29. Yet summary judgment is appropriate only if the extrinsic evidence is "so one-sided that no reasonable person could decide to the contrary." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 784 (1st Cir. 2011). The record contains substantial evidence supporting Sonoiki's interpretation, including Burke's testimony, Harvard allowing Sonoiki to speak as Male Harvard Orator and participate in graduation exercises, and Harvard failing to employ measures such as issuing sua sponte charges or placing Sonoiki on involuntary leave.

Harvard argues that Sonoiki claims that Harvard was "required to either (i) dispense with any preliminary investigation and formally charge him upon receipt of the complaints, or else (ii) grant him a degree—even if an investigation would reveal the complaints to be true." RB 48. Yet this limitation does not reflect Sonoiki's preferences, but Harvard's policy, which limited degree withholding to students who are "not in good standing or against whom a disciplinary charge is pending." Add. 56. Further, Harvard's portrayal of its options as binary is false. Harvard possessed means to address allegations before graduation, including

placing students on involuntary leave and issuing sua sponte charges. App. 78-79.

That Harvard declined to employ these mechanisms is not Sonoiki's doing.

A more recent degree controversy also supports Sonoiki's position. In May

2024, Harvard blocked 13 seniors from graduating "over their involvement in the

20-day pro-Palestine encampment in Harvard Yard." (See Joyce E. Kim and Neil

H. Shah, "Harvard Moves to Block Encampment Protesters From Graduating,"

The Harvard Crimson, May 18, 2024). The Harvard Corporation explained:

"Because the students . . . are not in good standing, we cannot responsibly vote to

award them degrees at this time." (See Emma H. Haidar and Cam E. Kettles,

"Harvard Corporation Overrides Faculty Vote on Disciplined Seniors, Sparking

Worries Over Governance," The Harvard Crimson, May 22, 2024). Unlike these

students, Sonoiki was in good standing on Commencement Day.

## B. Sonoiki's Present Contractual Right to His Degree Is Irrelevant

The court's conclusion that Sonoiki's claim fails because Harvard could

have revoked his degree post-graduation contradicts Harvard's testimony and

positions, ignores principles of contract law, and relies on speculative assumptions.

Harvard's position that it "was free to proceed with a post-commencement

revocation" contradicts its testimony and prior position. RB 19. Burke testified that

"[t]he Administrative Board doesn't govern graduates of Harvard College." App.

806. Further, Harvard argued that withholding Sonoiki's degree "before his

graduation—thus preserving his status as a student" was necessary to "maintain[] jurisdiction to adjudicate Betty's complaint." App. 905. Harvard's positions are inconsistent. Either preserving Sonoiki's status as a student was necessary to maintain jurisdiction over him, or Sonoiki's status as a student was irrelevant.

Further, the court's reasoning is circular. By using Harvard's eventual finding to justify Harvard's initial degree withholding, the court excuses a contract breach based on events subsequent to the breach. This approach misunderstands contract law and immunizes universities from accountability for breaches so long as the university eventually reaches a particular outcome. By this logic, Harvard could breach any obligation with impunity, knowing that a particular subsequent finding would justify Harvard's violations. This logic eliminates review of contractual adherence and incentivizes institutions to reach a particular outcome in cases that involve possible breaches. This circular logic is particularly harmful given the nature Harvard's process, where Ad Board meetings are shrouded in secrecy, with neither the student nor legal counsel permitted to attend.

Further, Harvard's argument shifts the summary judgment inquiry from what Harvard likely would have done to what Harvard possibly could have done. The relevant question is not Harvard's abstract authority, but the authority a rational juror could conclude Harvard would have exercised. Harvard's claim that it would have revoked Sonoiki's degree strains credulity. The Student Information

Form shows Harvard's restraint, stating that withdrawal of allegations by a complainant "will, under most circumstances, end the process" and that withdrawn allegations "cannot be filed again." App. 94. Harvard retained authority to proceed in "particularly serious" cases, but this exception proves the rule: Harvard's disciplinary system was designed to resolve matters during enrollment. *Id.*

Further, Harvard's actions surrounding graduation suggest that graduation was a deadline for initiating complaints. Administrators pressured complainants to make complaints before graduation, an effort that would have been unnecessary if Harvard wished to exercise the authority it now claims. App. 41, 758, 821-822.

Additionally, while Harvard claims that "[t]he undisputed facts show that Harvard has authority to revoke graduates' degrees and has done so in the past," this claim is based solely on Burke's testimony, which cites no examples of revoked degrees. Burke claims that Harvard has rescinded degrees when "a student, while enrolled at Harvard, violated Harvard's policies," but the sole policy examples he provides are cases when students "submitted fraudulent information as part of the application for admission" and cases where Harvard learned "of academic dishonesty; or when [Harvard] learned . . . that students had falsified information on their applications." The sole publicly available case of Harvard revoking a degree involves a Russian spy who attended the Kennedy School under the name of a deceased Canadian. See Naveen N. Srivatsa, "The Spy Who Added

Me," The Harvard Crimson (July 16, 2010). Notably, unlike sexual misconduct, proving fraud relies on documents rather than on credibility determinations, a reason Harvard might revoke degrees in these matters but not in others. Further, the Harvard College FAQ web page makes just one mention of degree revocation, stating, "Harvard rescinds degrees if misrepresentations in application materials are discovered." (See Harvard FAQ https://college.harvard.edu/resources/faq).

Harvard's argument also misunderstands damages. The relevant inquiry is whether Harvard's unauthorized withholding of Sonoiki's degree on May 30, 2013, caused Sonoiki harm, not whether Harvard might have separated Sonoiki from his degree through other means. Sonoiki's lost hedge fund opportunity at Taconic Capital illustrates this distinction. App. 764-774, 858. First, Harvard's claim that the fund rescinded Sonoiki's offer because he "lied" on his resume is false. Sonoiki was transparent with Taconic that he had completed all academic requirements, but Harvard was withholding his degree due to a disciplinary matter. App. 814-815. Sonoiki also provided resumes in discovery and Harvard identified no lies. Rather, Sonoiki requested that Harvard provide a letter confirming his completion of the "academic economics degree requirements." SA347-349. Jeffrey Miron, head of the Economics Department, wrote, "[i]f Damilare indeed satisfied all ec requirements, I don't necessarily have any objection to stating that fact." SSA8. However, Ellison blocked Miron's issuance of such a letter. *Id*. Sonoiki also

testified that Taconic's head of HR told him that the situation "shouldn't be a problem" two days before the offer was rescinded, long after Taconic possessed Sonoiki's resume and spoke to Harvard. App 815.

Harvard's claim that a resume lie caused the rescinded offer relies on a summer 2014 text from Sonoiki to Betty that reflects his attempt to spare Betty from feeling guilt over the lost offer. SA1428-1429. Betty's attitude in this exchange undermines Harvard's position. In discussing Sonoiki's job prospects, Betty's texts are supportive. One reads: "Well it's good that you have inside help though!! That's promising. Keep insisting the hedge fund that gave you the offer." *Id*. Another reads, "oh that's a great back up plan!!" Another states, "Yea it's good that you're positive lol." If Sonoiki had sexually assaulted Betty and Cindy, Betty's close friend, it strains credulity that Betty would maintain such a positive relationship with him. This communication supports Sonoiki's consistently held position that these were consensual interactions transformed into disciplinary matters through administrative pressure. App. 758.

This episode illustrates the damages from Harvard's wrongful withholding of Sonoiki's degree: a $350,000 per year role that would have "changed [Sonoiki's] life" and Sonoiki's "family's life," gaining him entry to the hedge fund industry. App. 846, 858, 860. Harvard argues that because the hypothetical revocation process would have ended by the time Sonoiki received the offer,

damages are moot. This argument fails. First, the timeline for revoking a degree is not necessarily identical to the timeline for an Ad Board process. Assuming identical timelines and assuming that Harvard would have pursued revocation, the degree would not have been revoked until December 2014, well after Taconic rescinded its offer. Further, a candidate who must explain to prospective employers that he never received his degree faces more difficulty than one who received a degree, even if that degree was later revoked. The former suggests an incomplete education. The latter confirms the completion of one's education.

## IV.  CONCLUSION

For the foregoing reasons, the District Court's order granting summary judgment should be reversed.

# <u>CERTIFICATE OF COMPLIANCE</u>

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 7,737 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Damilare Sonoiki*
Damilare Sonoiki
Pro Se Plaintiff-Appellant
April 7, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April, 2024, a copy of the Brief for the Plaintiff-Appellant Damilare Sonoiki was served electronically on Victoria Steinberg, Counsel for Defendants-Appellees, at vsteinberg@clohertysteinberg.com. Two copies were also sent to Ms. Steinberg via regular U.S. Mail to One Financial Center, Suite 1120, Boston, MA 02111.

*/s/ Damilare Sonoiki*
Damilare Sonoiki